[Crim. No. 3284. In Bank.—December 31, 1930.]

THE PEOPLE, Respondent, v. JOHN LEE HOWARD, Appellant.

Josiah Coombs, John A. Deweese and Delbert A. Hessick for Appellant.

U. S. Webb, Attorney-General, W. R. Augustine, Wm. F. Cleary and John L. Flynn, Deputies Attorney-General, Buron Fitts, District Attorney, and Wayne Jordan for Respondent.

WASTE, C. J.—The defendant was charged with the murder of Victor A. Cooley. The jury returned a verdict of murder in the first degree, without recommendation. The court below denied motions for new trial and for reduction of sentence, and pronounced sentence and judgment imposing the death penalty. Defendant appeals from the judgment of conviction and from the orders denying the said motions.

At the commencement of the trial, it appearing that the case would be somewhat protracted, two alternate jurors were duly selected, as provided by law. These alternates took the necessary oaths, assumed their places in the box with the regular jurors, and heard all of the evidence introduced upon the trial. At the conclusion of the evidence, and during the oral argument, one of the regular jurors sought the trial judge in chambers prior to the convening of court, and there disclosed to him that she personally knew two of the witnesses who had testified on behalf of the defendant in the cause, and that on account of certain facts which she personally knew concerning these witnesses, and which she disclosed to the judge, she was prejudiced against each of said two witnesses and their testimony. The judge thereupon called the attorneys for the prosecution and for the defense and also the defendant into his chambers and fully disclosed the situation to them. There was considerable discussion, in which the defendant personally took some part, concerning the situation in which the cause was placed, it

being generally agreed that the juror who had reported to the judge should be excused from passing on the case. Thereupon one of the defense counsel suggested a stipulation excusing the juror and selecting in her stead one of the alternates, stating ''there is no real reason why she should sit in preference to either of the two alternates. . . . Why can't we stipulate . . . that the juror be excused because of her statement to the court, and that the clerk may draw one of the two alternates''. A stipulation to this effect was entered into in open court by the respective counsel, and the regular juror was dismissed and one of the alternates, chosen by lot, took her place in the jury-box. The regularity of this proceeding by which the alternate was selected was also stipulated to. The closing arguments were then concluded, and the cause submitted to the jury, which, as already stated, returned a verdict finding defendant guilty of murder in the first degree, without recommendation.

It is now contended by the defendant that, upon discovering the state of mind of the regular juror, a mistrial should have been ordered, and that to substitute the alternate for the regular juror under such circumstances amounted to a reversible error, in that he was thereby deprived of a trial by jury as guaranteed by section 7 of article I of the Constitution. While the value and importance of the privilege thus guaranteed cannot be overemphasized, on the record now before us we cannot see how or wherein there was any invasion of the common-law right of a jury trial. The first essential of a common-law jury in criminal causes is a jury of twelve citizens, no more nor less, drawn from the locality, duly examined and sworn to try the cause. No objection was offered to the panel in this case. The second requirement is that the jurors must be impartial. No claim is made that juror Shields, the alternate selected, was not in fact a fair and impartial person to act as a juror. While the record brought here does not contain the examination of the jurors on *voir dire*, it does indicate that the same proceedings were had in the selection of the alternate jurors as in the case of the first twelve who took their places in the box. We may assume that the defendant was satisfied that the alternate jurors thus selected would give him the fair and impartial trial to which he was entitled, should

either be called in lieu of one of the other jurors. The third essential is that the verdict shall be unanimous, and that was so in this case, for the record shows that the twelve jurors agreed and returned a unanimous verdict.

While the circumstances of this case are not such as to bring it within the purview of section 1089 of the Penal Code providing for alternate jurors, we think the procedure by which the alternate juror was substituted in the place and stead of the regular juror was, at most, but an irregularity which in no way substantially affected the defendant's rights. In the execution of the means which the lawmakers provide to enforce the guaranties of the organic law, the end to be effected must be through the adoption of a reasonable and practical method to secure attainable ends. When this has been done, nothing more can be demanded, from the very nature of things. It is not claimed that the verdict would have been any different had the alternate juror not participated in the deliberations of the jury. He was subject to the same challenge and took the same oath as the other jurors. We should assume that in all respects he obeyed his oath and that he well and truly tried all the matters in issue and rendered a true and impartial verdict in the cause. Defendant's right was to a fair and impartial jury, not to a jury composed of any particular individuals. (*People* v. *Durrant,* 116 Cal. 179, 199 [48 Pac. 75].) The situation here presented is not one in which a waiver of the right to a jury trial in a felony case enters into the consideration.

No case has arisen in this state, or perhaps elsewhere, precisely like the case at bar in its facts. Earlier cases, in which disqualification of a juror has been raised after verdict in criminal causes, are reviewed in *People* v. *Duncan,* 8 Cal. App. 186 [96 Pac. 414]. In that case, one Bernard Sherry appeared at the trial and substituted himself as a juror in place of John H. Sherry, whose name was upon the jury list, and who had been regularly subpoenaed to attend court as a trial juror. Upon the impanelment of the jury, the name of the rightful juror was drawn, and in answer thereto the other Sherry took his place in the box and, after due examination as to his qualifications, was accepted and sworn as a juror and acted throughout the

trial of the cause. The jury returned a verdict of guilty of murder in the second degree. On appeal, it was contended that Bernard Sherry never became a juror because he was not selected and returned as required, and that therefore the verdict was the verdict of but eleven jurors. The court swept aside the contention, saying that it begged the question. The judgment of conviction was affirmed, and the petition to have the cause heard in the Supreme Court was denied.

We find no merit in defendant's first contention.

Prior to his untimely death, the decedent was engaged in the automobile rental business in the city of Pasadena. In the early part of January, 1928, the defendant was employed by him, and by mutual agreement went to live with the decedent and his wife. The Cooleys became estranged, and separated in September, 1928, whereupon the defendant and decedent took an apartment together. They were apparently on good terms and quite friendly. At about 12:50 A. M. on the morning of April 17, 1929, the defendant telephoned to the Pasadena police station and stated to the officer responding to the call: "This is Jack Howard. There has been a murder committed in my apartment. I have called the ambulance. I wish you would send a couple of the boys over." Upon arriving at the apartment the officers found the decedent sitting on the edge of the bed in a semiconscious condition. The room was in a state of disorder, personal belongings having been upset and scattered about, giving evidence of the perpetration of a robbery. The injured man was removed to the emergency hospital, and from there to the Pasadena hospital, where he was operated on to relieve paralysis resulting from a blow on the skull with a solid instrument. It was the doctor's opinion, given at the trial, that the blow had been struck while the decedent was lying down. The decedent never regained consciousness, and passed away three days later. Shortly after reporting the matter to the police, the defendant stated that he had no definite idea as to the identity of the perpetrator of the crime, but mentioned the name of a person who was supposed to have previously threatened the decedent's life. At that time the defendant also stated that he had driven the decedent home from the garage on the night of the homicide

at about 9 P. M., and, as was his usual custom, returned to the garage and there busied himself about the automobiles until the last of the rented cars had been brought in, whereupon, at about 1 A. M. he again returned to the apartment and found the decedent in an unconscious or semi-conscious condition, which prompted him to notify the authorities. Substantially the same story was told by the defendant at the coroner's inquest held on April 23, 1929, and again repeated to the police on the same day. Three days later, however, defendant modified his story and told Detective H. M. Thomas that he had driven to the apartment alone on the night of the homicide at about 10:30 P. M. to secure a bottle of whisky; that the decedent was there and upbraided him for absenting himself from the garage; that the decedent grabbed him and a struggle ensued in which he struck the decedent on the head with his mechanic's hammer; that he thought he had killed the decedent, and thereupon disordered the room in order to give the appearance that the homicide had been committed in an attempt to burglarize the apartment; that he then went to the garage and performed his usual duties, returning to the apartment after 12 P. M., when he notified the police. Defendant also stated to the detective that the killing was not premeditated, and expressed his willingness to plead guilty to a charge of manslaughter. After the usual proof as to its voluntary character, the prosecution introduced in evidence, over defendant's objection, a written confession made and signed by the defendant on the same day as the oral statement just above outlined had been made, wherein the defendant admitted striking the decedent with a hammer while struggling with him.

The defendant took the stand in his own behalf and related many of the matters already narrated. He reiterated his original story to the effect that he had found the apartment disordered and the decedent injured when he returned after closing the garage. He did not deny making the confession, but testified that the story therein related was concocted by him, upon suggestion of the police, in order to clear the decedent's estranged wife, whom he claimed was innocent, and still leave himself open to no greater charge than that of manslaughter. Defendant admitted having

called on the decedent's estranged wife on the night of the homicide. On cross-examination, defendant stated that prior to the homicide he had given her several Christmas and birthday gifts, but denied that he had ever loved the woman or proposed marriage to her. He also admitted saying to the district attorney subsequent to the confession: "You are trying to ring in an innocent person [meaning decedent's wife]. I done this without anybody's help," but insisted that he said this to divert suspicion from Mrs. Cooley, and to back up his confession. While on the stand, defendant conceded that the confession had not been procured by means of threats or violence, but stated it was the result of promises by the authorities to merely charge him with manslaughter. The evidence upon this issue was conflicting, and the question was one for the jury's determination. Defendant produced several witnesses who testified that his general reputation for peace and quiet was good. Much of defendant's evidence was controverted by the rebuttal evidence of the prosecution. Among other witnesses called by the People in rebuttal was the decedent's estranged wife, who testified that defendant had proposed marriage to her, but that she had told him, in substance, that she would never marry anyone as long as Mr. Cooley lived. This was proper rebuttal evidence, for defendant on cross-examination had testified otherwise.

The defendant contends that the evidence does not warrant a verdict of first degree murder because of the asserted absence of a showing of express malice. Murder is defined as the unlawful killing of a human being with malice aforethought. (Sec. 187, Pen. Code.) Such malice may be express or implied. It is express when there is manifested a deliberate intention unlawfully to take away the life of a fellow-creature, and implied when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart. (Sec. 188, Pen. Code.) All murder which is perpetrated by means of poison, or lying in wait, torture, or by any other kind of wilful, deliberate, and premeditated killing, or which is committed in the perpetration or attempt to perpetrate arson, rape, robbery, burglary or mayhem, is murder in the first degree; and all other kinds of murders are of the

second degree. (Sec. 189, Pen. Code.) To be murder of the first degree, under our statute, the killing must be premeditated, except when done in the perpetration of certain felonies; that is to say, the unlawful killing must be accompanied with a deliberate and clear intent to take life. If the act be preceded by, and be the result of a concurrence of will, deliberation and intent, the crime of first degree murder is proved. (*People* v. *Bellon,* 180 Cal. 706 [182 Pac. 420].) When the killing is proved to have been committed by the defendant, and nothing further is shown, the presumption of law is that it was malicious and an act of murder; but in such a case the verdict should be murder of th second degree, and not murder of the first degree. (*People* v. *Knapp,* 71 Cal. 1, 6 [11 Pac. 793]; *People* v. *Ford,* 85 Cal. App. 258, 263 [258 Pac. 1111].)

In the present case, the prosecution relied principally on the defendant's confession to prove his connection with the offense. If the confession be disregarded, the record is entirely destitute of evidence tending to establish the circumstances and conditions actually existing just prior to and at the time of the striking of the fatal blow. If, as urged by the People, the jury in weighing and considering the evidence might properly reject as untrue that portion of the confession wherein defendant charged the decedent with having been the aggressor in a quarrel which led up to the homicide, there remains no evidence from which it might reasonably be deduced that the killing was the result of a wilful, deliberate and premeditated intent to kill. We do not question the propriety of the jury's action in rejecting any portion of the defendant's evidence or confession which to it was unworthy of belief. However, if it be assumed that this was done in the present case, there is a dearth of evidence tending to show the conditions as they existed at the time of the homicide, and from which it might reasonably be held that the murder was, in fact, wilful, premeditated and intentional. In this regard, the state failed to satisfy the burden of proof. On the other hand, if it be assumed that the jury accepted defendant's confession *in toto,* the offense would still be that of second degree murder, for defendant did not satisfactorily establish such provocation as would excuse the homicide or reduce it to manslaughter.

The commission of the homicide by the defendant being proved, the burden of proving circumstances of mitigation, or that justify or excuse it, devolves upon him, unless the proof on the part of the prosecution relieves him of this burden. (Sec. 1105, Pen. Code.)

Section 1181 of the Penal Code, as amended in 1927 (Stats. 1927, p. 1037), provides, in part, that if the evidence in a criminal cause shows the defendant to be not guilty of the degree of the crime of which he was convicted, but guilty of a lesser degree thereof, or of a lesser crime included therein, the trial court or any court to which the cause may be appealed may modify the judgment accordingly without granting or ordering a new trial. This court had occasion to consider the amended section in the case of *People* v. *Kelley,* 208 Cal. 387, 391 [281 Pac. 609]. We are of the view that the record now before us establishes murder of the second degree. We entertain a doubt as to its showing murder of the first degree. Our attitude of mind seems to be shared by the prosecution. While contending that the evidence is amply sufficient to support the verdict, the People concede that it is "not as strong as that usually accompanying first degree murder cases". Under no theory, they state in their brief, can it be said that the evidence does not "support a judgment of second degree murder". What has been said under this assignment sufficiently disposes of the defendant's contentions touching asserted errors of the court below in charging the jury upon first degree murder, and in denying his motions for new trial and reduction of sentence. We have examined the remaining assignments of error, including those having to do with the trial court's rulings on the evidence, and find nothing approximating prejudicial error.

The judgment of the lower court of murder of the first degree is modified. The cause is remanded to the trial court with directions to enter a judgment against the defendant finding him guilty of murder of the second degree, and to thereupon pronounce judgment upon him as prescribed by law.

Preston, J., Langdon, J., Curtis, J., Shenk, J., and Seawell, J., concurred.

RICHARDS, J., Dissenting.—I dissent. It is conceded in the foregoing opinion that the circumstances of this case are not such as to bring it within the purview of section 1039 of the Civil Code, which has reference to the substitution during a criminal trial of alternate jurors. The case stands therefore as though there existed no provision of law permitting substitution of another person in the place and stead of a regularly drawn and impaneled juror. In the absence of such legal warrant, the person introduced into the jury in the midst of the trial in this case was nothing more than a mere bystander. It is also practically conceded in the foregoing opinion that the defendant did not expressly consent in open court to the substitution of such bystander in the place and stead of the regular juror during the trial of the cause. This to my mind under authorities hereinafter to be cited amounted to a violation of the constitutional right of the defendant to a trial by jury. The argument that the substituted person was otherwise qualified to act and serve as a juror, that he took the usual oath and that it must be assumed that he obeyed the same to the extent of joining with the regular jurors in rendering a just and impartial verdict is utterly sophistical, and if permitted to pass without protest would permit any number of bystanders to be introduced in the regular panel during the trial of criminal causes, and would entirely subvert the constitutional guarantee as to trial by jury.

Section 7 of article I of our state Constitution provides in part that, ''The right of trial by jury shall be secured to all and remain inviolate''. The value and importance of the right thus guaranteed cannot be overemphasized. It has always been considered as one of the principal bulwarks of liberty under both the English and American systems of government and constitutional law. While the origin of this institution may be uncertain, it has been so long and so deeply rooted in the institutions of the English people that neither conquest nor change of sovereignty ever operated to either abolish it or even to work its material modification. We find in Blackstone not only the most correct estimate of this institution, but also its greatest encomium, when he states: ''The trial by jury has ever been and I trust ever will be looked upon as the glory of the English law.

. . . It is the most transcendent privilege which any subject can enjoy, or wish for, that he cannot be affected either in his property, his liberty or his person, but by the unanimous consent of twelve of his neighbors and equals.'' The learned author refers to a celebrated French writer (Montesquieu, Spirit of Laws, XI, 6), who concludes that those who assert because Rome, Sparta and Carthage have lost their liberties, therefore those of England in time must perish, should have recollected that Rome, Sparta and Carthage, at the time when their liberties were lost, were strangers to the trial by jury. (2 Blackstone (Jones), pp. 1989, 1991.) In his great work on ''Laws and Jurisprudence of England and America'', at page 121, Judge Dillon states: ''I consider the trial by jury an essential part of our judicial system. It has a cherished tradition. Its roots strike down deep into the experience, the life, and the nature of the people who have developed and perfected it. It gives an individuality to our legal system. It is a vital part of it.'' The fundamental privilege thus developed under English institutions has been secured to every person in our own country charged with crime, by the Constitution of the United States and of each individual state. The language of the Constitution of this state has been in part above quoted and the courts of this state have uniformly held that the cardinal principle therein enunciated is to be considered as meaning that the essential features of trial by jury as known to the common law must be preserved and its benefits secured to all those who were entitled under the common law to the right of trial by jury. (*People* v. *Powell*, 87 Cal. 348 [11 L. R. A. 75, 25 Pac. 481]; *People* v. *Peete*, 54 Cal. App. 333, 365 [202 Pac. 51]; *People* v. *Kelly*, 203 Cal. 128, 133 [263 Pac. 226]; 15 Cal. Jur., p. 325, sec. 5.) Under the common law there was no provision for alternate jurors, and the rule was well settled that if during a trial a juror became incapacitated or was for any reason discharged, a new juror either had to be sworn and the trial begun anew, or the jury had to be dismissed and a new jury impaneled. This is still the law in those jurisdictions where there are no alternates or where the alternate jurors have in the course of the trial become regular jurors. It is so stated in section 1123 of our Penal Code, which in part provides that, ''If

after all alternate jurors have been made regular jurors, a juror becomes so sick as to be unable to perform his duty and has been discharged by the court, a new juror may be sworn and the trial begun anew, or the jury may be discharged and a new jury then or afterwards impaneled". It has, however, been held that the legislature has power to provide for alternate jurors, and our state legislature has so provided from a time as far back as 1895, when section 1089 was added to our Penal Code (Stats. 1895, p. 279), which section provides for the selection of alternate jurors in the discretion of the court, and their substitution in place of the regular jurors in certain situations. This section of the Penal Code was amended in 1927 [Stats. 1927, p. 1063] so as to provide that the court may in felony cases direct the calling of not more than two alternates, who may sit as regular jurors under the conditions expressly provided for in the section as thus amended, which, in so far as these are pertinent to the situation before us, reads as follows: "If before the final submission of the case a juror dies or becomes ill so as to be unable to perform his duty, the court may order him to be discharged and draw the name of an alternate, who shall then take his place in the jury box and be subject to the same rules and regulations as though he had been selected as one of the original jurors." The constitutionality of the foregoing provisions of the Penal Code were fully considered and upheld in the case of *People* v. *Peete, supra,* wherein a rehearing was denied by this court, and which decision meets with our full approval, and it may be taken to be settled law, that the legislature has the power to provide for alternate jurors in a proper case. The legislature, as we have seen, has so provided in sections 1089 and 1123 of the Penal Code, but in so doing has expressly limited the right of the trial court in any criminal case to substitute alternate jurors for any one or more of the regular jurors to try such cause to cases where "before the final submission of the case a juror dies or becomes ill so as to be unable to perform his duty". This express limitation upon the power of the trial court to substitute alternate jurors for regular jurors renders the conclusion irresistible that in no other instance than that of the death or serious illness of a regular juror is the court given any power whatever to make

such substitution. It would seem to follow as a necessary conclusion that the substituted alternate juror in the instant case, having been called to replace a regular juror who had neither' died nor become ill so as to be unable to perform his duty, had no more right to sit or act in the case than any other person who might have been selected under like circumstances by any method not authorized by the express provisions of the foregoing sections of the Penal Code. This conclusion brings us to a consideration of the next question involved in this appeal, which is as to whether under the provisions of our Constitution and laws a defendant can waive his aforesaid constitutional right to trial by a common-law jury.

Prior to the amendment of the state Constitution in 1928 it was well settled by the decisions of this court and of the appellate court of this state that neither the defendant nor his counsel could waive the right to a jury trial in a felony case. (*People* v. *Deegan,* 88 Cal. 602 [26 Pac. 500]; *People* v. *Metropolitan Surety Co.,* 164 Cal. 174 [Ann. Cas. 1914B, 1181, 128 Pac. 324]; *People* v. *Nakis,* 184 Cal. 105 [193 Pac. 92]; *Amos* v. *Superior Court,* 196 Cal. 677 [239 Pac. 317]; *Ex parte Bracklis,* 52 Cal. App. 274 [198 Pac. 659]; *People* v. *Garcia,* 98 Cal. App. 702 [277 Pac. 747]; *People* v. *Spinato,* 100 Cal. App. 600 [280 Pac. 691].) In the year 1928, however, section 7 of article I of the state Constitution was amended so as to read in part as follows: ''The right of trial by jury shall be secured to all and remain inviolate; but in civil cases three-fourths of the jury may render a verdict. A trial by jury may be waived in all criminal cases by the consent of both parties expressed in open court by the defendant and his counsel.'' In the case of *People* v. *Garcia, supra,* it was held that under the foregoing provision of the Constitution as thus amended the defendant in felony cases must personally and expressly consent to the waiver of trial by jury, and that the consent of the defendant's counsel, even though expressed in his presence, was not sufficient to constitute such a waiver. In the case of *People* v. *Spinato, supra,* the case of *People* v. *Garcia, supra,* was cited with approval, in the face of the strenuous insistence on behalf of the people that under the decisions of federal and other state courts an express waiver of this constitutional

right by counsel in the presence of the defendant should be held an implied waiver, sufficient to satisfy the constitutional and statutory provisions touching the right of trial by jury. The cases thus cited were analyzed by the appellate court and were held to have no application to the situation in California created by the aforesaid recent amendment to its Constitution, expressly providing that in order to a waiver of the right to jury trial in felony cases the ''consent of both parties expressed in open court by the defendant and his counsel'' must concur in order to accomplish such waiver.

The Supreme Court of the United States has had occasion in a recent and very well reasoned decision (*Patton* v. *United States*, 281 U. S. 276 [74 L. Ed. 845, 50 Sup. Ct: Rep. 253]) to pass uopn the right of a defendant to a common-law jury of twelve persons, wherein it was held that this right on the part of a defendant was of such importance that he alone could personally stipulate it away by his express agreement in open court to be tried by less than twelve jurors. It would seem to be axiomatic that if a defendant may only by his personal and express agreement in open court waive the right to trial by a common-law jury of twelve persons, he cannot, without such express waiver and consent, be put upon his trial before any less number than twelve jurors, since, as was held by the Supreme Court of the United States in *Patton* v. *United States, supra,* no distinction can be drawn between the effect of a complete waiver of a jury and consent to be tried by a less number than twelve, but that both forms of waiver amount in substance to the same thing. In the light of the foregoing decisions and of the admitted facts of the instant case I am constrained to hold that in the absence of an express agreement on the part of the defendant himself, consenting to the substitution of an alternate juror in the place and stead of one of the regular jurors impaneled to try the cause, and who was shown to be neither dead nor ill so as to be unable to proceed with the trial, it was prejudical error on the part of the trial court to undertake to make such substitution and thereafter to proceed with such trial before eleven regular jurors and one alternate juror, with the result of the defendant's conviction.

It is, however, contended by the prosecution that the foregoing error of the trial court was merely an error in procedure for which the case should not be reversed, under the provisions of section 4½ of article VI of the state Constitution, in the absence of a showing that such error has resulted in a miscarriage of justice. I am, however, of the opinion that there is no merit in this contention and that the denial of the right of trial by a common-law jury to a party so entitled amounts in itself to a miscarriage of justice, and that to such a situation section 4½ of article VI of the Constitution can be given no application. (*People* v. *Hall,* 199 Cal. 451, 458 [249 Pac. 859], and cases cited; *People* v. *O'Connor,* 81 Cal. App. 506 [254 Pac. 630]; *People* v. *Young,* 100 Cal. App. 18 [279 Pac. 824].)