[Crim. No. 4235. In Bank.—October 30, 1939.]

THE PEOPLE, Respondent, v. LLOYD W. SMITH, Appellant.

James F. Gaffney for Appellant.

Earl Warren, Attorney-General, and F. Walter French, Deputy Attorney-General, for Respondent.

EDMONDS, J.—The proceedings which resulted in a judgment imposing the death penalty upon conviction of the crime of murder in the first degree are presented for review under section 1239 of the Penal Code, which provides for an automatic appeal in such cases.

After pleas of not guilty and not guilty by reason of insanity, the defendant was tried by the court, sitting with a jury, and found guilty in a verdict which included no provision concerning the punishment to be imposed therefor. A trial upon the issue of insanity followed and resulted in a verdict by the same jury finding that at the time of the homicide the defendant was sane. After a motion for a new trial had been made and denied, judgment was imposed.

Grover Russi, the victim of the homicide, with his wife, their two children, and William Johnson, Mrs. Russi's brother, lived on a ranch near Sacramento. About seven years before, Mr. Russi took the defendant from an old men's home and since that time had given him board, lodg-

ing and small sums of money for doing chores on the farm. According to the testimony offered by the prosecution, the crime was committed after a dispute over a trivial matter at the breakfast table. The defendant became angry and jumped up from his seat but Mr. Russi "sat him back in the chair". Within a few minutes the defendant went out to bring in some firewood for the kitchen range. Shortly thereafter Mrs. Russi left the farm to take her son to school, and Mr. Johnson started for another ranch.

Soon Joyce Russi, the daughter, who was in her bedroom, heard blows and ran to the kitchen. She testified that the defendant was beating her father, who was at that time prone on the floor, with two pieces of firewood. When she attempted to help her father she was struck several times by Smith, who muttered, "You son of a gun, I will get you too." Her screams and the sound of blows were heard by Mr. Johnson, who immediately ran into the house and disarmed the defendant. Mr. Russi died as a result of two deep wounds on the back of his head.

No brief has been filed on behalf of the defendant, but the contentions advanced by him upon the trial and the affidavits relied on in support of his motion for a new trial will be considered and passed on.

■ As a defense to the charge against him, the defendant testified that he had been drinking and because of his intoxication he did not have the requisite intent to commit the crime of murder in the first degree. Although it appears that he may have been in this condition, it was a state voluntarily brought about, and, therefore was no excuse for the crime. However, the evidence concerning the defendant's intoxication was properly presented to the jury for its consideration in determining whether he had the intent to commit the act charged against him. (Sec. 22, Pen. Code.) That the jurors believed that he was not so intoxicated as to prevent him from having a specific intent to kill his employer, is implicit in the verdict, returned after they had been instructed as to the law governing his conduct under such circumstances.

■ At the time of his trial, the defendant testified that he had little recollection of the events which occurred when Mr. Russi was killed. However, he remembered that Mr. Russi struck him on the face during breakfast. Mrs. Russi, her

son and her brother, each denied that any such thing occurred, but even if the defendant's statement is true, there is no showing that the killing was done in the heat of passion following the blow. On the contrary, he testified that he left the kitchen two to five minutes after Mr. Russi attacked him and it was ten or fifteen minutes later when he returned with the wood. Under these circumstances, the jury was justified in finding the defendant guilty of murder in the first degree. (*People* v. *Golsh*, 63 Cal. App. 609 [219 Pac. 456].)

The jury was instructed that it might find the defendant guilty of murder in the first or the second degree, or of manslaughter or not guilty and the different crimes were defined. Other instructions fully and fairly stated all of the law applicable to the issues raised by the information and the defendant's pleas.

At the insanity hearing the defendant testified that he resented the refusal of deceased to pay him more wages in addition to his board, lodging, clothing and spending money. This testimony was inadequate as a basis for any opinion of legal insanity. No expert or lay opinion that appellant was insane was expressed.

Each of two experts appointed by the court examined appellant prior to the trial. Dr. Margaret Smythe testified, "I think he was sane." On cross-examination the most favorable admission which she made in appellant's behalf was to the effect that she did not "think the man would ever do such a deed unless he had been drinking. . . . " This she qualified with the statement ". . . but I think he is a sane man".

Dr. Bert F. Howard expressed the same opinion, saying "I thought he was sane." On cross-examination he was asked whether brooding over fancied wrongs would have led to confusion in the defendant's mind. The doctor replied, "That would be merely a directing cause; I think it must have been—he was very emotional and alcohol releases these inhibitions, and as soon as the inhibitions were released he boiled over, as it were."

No effort was made to show any ancestral history of insanity. The only medical history disclosed at the insanity hearing was that appellant had contracted syphilis in 1906, which caused hardening of the arteries. This condition was considered by the doctors as a cause for the appearance of

premature old age in appellant, but it does not appear that any mental deterioration existed by reason of the syphilitic history.

In support of a motion for a new trial, the defendant's counsel presented his affidavit stating he had discovered new and important evidence which he had not known of before. This evidence was stated to be the testimony of the two alienists who were appointed by the court and appeared as witnesses at the trial upon the issue of insanity, and a deputy sheriff. According to the affidavit, each of the physicians would testify that because of the defendant's intoxication he did not act with premeditation. The other witness, it was said, would testify that immediately after the homicide the defendant was in an intoxicated condition.

No excuse was offered for not calling these witnesses except that one of the physicians refused to give a statement of his findings prior to the trial. However, the court appointed the two physicians as alienists at the time the defendant was arraigned and the deputy sheriff is the officer who arrested him. Under these circumstances, and considering the testimony which, it was asserted, each would give, the motion was properly denied.

The judgment is affirmed.

Shenk, J., Curtis, J., Knight, J., *pro tem.*, Spence, J., *pro tem.*, and Waste, C. J., concurred.

HOUSER, J., Dissenting.—I dissent. From a careful reading of the reporter's transcript of the proceedings herein, I am convinced that the record discloses no prejudicial error. But from the conceded fact that, at the moment when the homicide was committed, defendant was under the influence of intoxicating liquor, it is doubtful that he was capable of forming an express or specific intent to commit a crime, or of appreciating the difference "between right and wrong". To some extent, the circumstances indicate a "sudden brainstorm". One of the alienists testified as follows:

"I made a physical examination with reference to his reflexes to see if they showed any present signs of syphilis; there were no neurotic signs of syphilis,—and, I continued the examination,—the medical condition showed no dementia of the type which you would expect to find following after

a long duration, and I didn't find any sign of that. I think the story he gave me was very revealing, it showed a keen mind, and I believe he was telling the truth; I think that he was very much confused at the time, that there was certain events of the morning which he had forgotten entirely,—I don't think he remembered the facts exactly; I think, as he told me his story, he acted in intense anger, under a reaction, an emotional reaction of anger, so certain events which preceded the act, I think the anger perhaps played as much part in his forgetting as the alcohol; but he related as to the amount of alcohol he had taken. I think, considering his age and with hardening of the arteries probably including syphilis in his system, caused the arterial hardening, and that he was more susceptible to the alcohol than he would otherwise have been, and that he was definitely confused and reacted emotionally and almost instinctively in entering into this fight. I think it was, as far as this act I am considering is concerned, it was an unpremeditated fight. . . . he was very emotional and alcohol releases these inhibitions, and as soon as the inhibitions were released he boiled over, as it were. . . . A. I am rather inclined to think he thought he was doing right. Q. But could he distinguish between what was right and what was wrong? A. I think he had power of analysis, but his emotions overcame his inhibitions.'' And in that connection, the other alienist testified that:

'' . . . I don't think the man would ever do such a deed unless he had been drinking; I think there was no venom, if he had any it wasn't very great,—probably at that time he didn't control himself as he did at other times,—he said if he hadn't got that crack in the jaw this wouldn't have happened. So far as I could see, I didn't feel he would kill anybody in cold blood, I think he just was worked up to the pitch he got too excited, that he just went beyond himself, but I think he is a sane man.''

There was no direct evidence to the contrary. Furthermore, it appears that on the trial of the issue of ''not guilty by reason of insanity'', after the jury had been in conference for approximately one-half hour, it returned into court, whereupon the following colloquy occurred:

''The Court: I understand, Mr. Foreman, there is something you wish to take up with the court? Juror Godfrey Simon: Yes, your Honor, we can't seem to come to any agree-

ment whatever. If we had had the evidence that was presented today, yesterday, the jurors feel like there would have been an entirely different verdict, and they ask for further instructions what we should do. The Court: My only answer to you, Mr. Foreman, is, the question which is submitted to you and which you are to decide is the fact as to whether the defendant was sane or insane at the time of the commission of the act alleged in the information. Juror Simon: I understand, but I haven't found the jurors willing to vote upon it."

It thus becomes clear that, had the issue of "not guilty" been tried contemporaneously with the issue of "not guilty by reason of insanity" (as formerly was permitted by statute), a verdict would have been returned that would have been "entirely different" from a verdict of "guilty of first degree murder". In other words, the verdict could have been no greater than "first degree murder", with recommendation of life imprisonment. But the verdict might have been "second degree murder", or even "manslaughter".

Although with reference to the provisions of subdivision 6 of section 1181 of the Penal Code, which purport to empower this court to modify a judgment of conviction by decreasing the degree of the crime, I deny that the legislature possesses any such power, but, to the contrary, insist that all jurisdiction and powers of this court must be conferred thereon by constitutional provision (*People* v. *French,* 12 Cal. (2d) 720, dissenting opinion, at p. 780 [87 Pac. (2d) 1014]), nevertheless, my conclusion herein, based upon the inherent and implied power of this court, is that the offense should be reduced to that of second degree murder. (*People* v. *Kelley,* 208 Cal. 387 [281 Pac. 609] ; *People* v. *Howard,* 211 Cal. 322 [295 Pac. 333, 71 A. L. R. 1385].)