[Crim. No. 1820.   Third Dist.   Mar. 3, 1943.]

THE PEOPLE, Respondent, v. ALDINO CARDOZA, Appellant.

Stephen P. Galvin for Appellant.

Robert W. Kenny, Attorney General, and T. G. Negrich, Deputy Attorney General, for Respondent.

ADAMS, P. J.—Appellant was charged with murder. He pleaded not guilty and not guilty by reason of insanity. The jury found him guilty of murder in the first degree with a recommendation of life imprisonment; and upon the trial of the issue of not guilty by reason of insanity, found that he was sane at the time of the commission of the homicide. Thereafter, a motion for a new trial was denied, and from the judgment of conviction and order denying a new trial the defendant has appealed solely upon the ground that the verdict is contrary to the evidence and is contrary to law.

The victim of the homicide was defendant's wife. She was 23 years old and he was 45. They had been married about six years and had a boy child aged 5. She died as the result of a beating administered by her husband with an ax handle. The autopsy revealed extensive abrasions over her head, shoulders and back where portions or layers of the skin had been mashed off. These areas extended down to the buttocks, and there were similar areas, smaller in scope, on both arms and hands, and some small spots on the face. On the outside of the right arm there were two complete imprints of what evidently were bites. On the back of the head there was a very large hematoma covering a good portion of the top and back of the head, which was fluctuating, in other words, contained a fluid. The cause of death was given as shock and hemorrhage, possibly severe cerebral concussion.

There were no witnesses to the beating, but it was admitted by defendant. Death occurred some five hours afterward, but deceased was unable to make any statement when third persons arrived upon the scene. The first to arrive was a neighbor, Joe Lemos, who was called by defendant about 1:10 a. m. and requested to come immediately. Lemos testified that on his arrival Cardoza stated, "I think I have killed my wife"; that he entered the house, found Mrs. Cardoza in bed, went immediately for a doctor, and also advised the sheriff. The doctor arrived first but was unable to arouse the victim under emergency treatment, and she died at 2:50 a. m. He described the hematoma as a sort of delayed hemorrhage at the base of the skull, which had been produced by the heart's pumping blood through a small rent in the blood vessel in that particular vicinity; that the size of the hematoma indicated that its formation was a matter of hours, and that the pressure caused by same, in an area where the respiratory and other centers which control vital processes are located,

was the cause of death in this particular instance; that if decedent had had medical attention earlier her chances of recovery would have been very good.

On arrival of the sheriff Cardoza met him, and being asked what was the trouble said it was "man trouble." He was taken into custody, and when asked with what he had struck his wife, took the sheriff into the yard and showed him the ax handle in two pieces near a small wood pile in the rear of the house. The sheriff examined the premises with a flashlight, found marks and handprints on the ground indicating a struggle, a wisp of hair, a pair of overalls, a little ornamental pin, and a shoe. Pictures of the premises, articles and conditions were taken after daylight. The sheriff testified that at the time of his arrival Mrs. Cardoza was lying on the bed and the doctor was giving her artificial respiration; that she did not speak, and died shortly thereafter; that Cardoza told him that an argument had been going on over this "man trouble" for several days and that the teeth marks on his wife's body had been made by him several days before when he had her up against the wall, choking her; that that evening after dinner Mrs. Cardoza had gone out to the toilet in the rear of the house, and that she was coming out of it with one leg out of the overalls worn over her dress "and it was at that time he picked up the ax handle and started after her."

At the trial of the case the child of the parties was called as a witness, and after examination by the court was permitted to testify. Asked if he remembered the night his mother died he stated that he did; and when asked what his father did to his mother said, "He took an ax handle and hit her"; and on being asked what happened after his father hit his mother, answered, "He drug her in, see."

At the trial Cardoza testified in his own behalf that about three or four days prior to the homicide his wife had told him of various and many indiscretions committed by her prior to and subsequent to their marriage and up to the date of the conversation; that she had also told him that she had practiced, almost habitually, unnatural sexual acts of the vilest nature; that on the following Saturday night she had told him of other such acts of misconduct. He said that after she had divulged these facts to him he intended to leave her and that he asked her to write out the things she had told him so that he could give the statement to her mother, to show

why he was leaving her, as he testified her mother had told him that although Mrs. Cardoza had been wayward as a young girl she had reformed since her marriage; that on Tuesday evening after he had returned from a trip to town with his wife and his partner, and after supper, Mrs. Cardoza had put the child to bed and he had lain down beside the baby until it went to sleep; that he then went outdoors to feed the dog; that as he came out of the house his wife was coming out of the toilet; that he asked her some further questions regarding her intimacy with different men, and in the course of the conversation asked if she had been intimate or had anything to do with the son of his partner who was thirteen years old; that she admitted that she had, and told him the number of times and occasions and what she had done; that they were standing together in the back yard about ten or twelve feet from the house near the woodpile, and when she made her statement regarding the boy he pushed her from him and she fell down; that when she got up he asked her if she had practiced any unnatural acts on anybody younger than this thirteen-year-old boy and she answered, "yes, one"; that he then said, "not the baby," meaning his own child, and she answered, "yes"; that he then went off his head and knew nothing until he came to a few minutes or seconds later with the broken ax handle in his hand; that he must have hit her, and that she told him he had done so; that they then went into the house and talked for a considerable time, maybe an hour or two hours; that she then lay down on the bed and later commenced to complain of pains; that he suggested a doctor but she said there was no need of a doctor unless she got worse; that he called Lemos about 1:10 a. m. and that when the latter arrived he went for a doctor.

According to the testimony of the sheriff a note in Mrs. Cardoza's handwriting, reading "I, Pauline Cardoza was marr——," was on the kitchen table and was picked up by Cardoza as they passed through on their way out into the yard where he was shown the broken ax handle.

On this appeal it is not urged that defendant is not guilty of any offense, but that under the evidence the only verdict that properly could be returned is manslaughter; that there is no evidence that the killing was willful, deliberate, premeditated and with malice aforethought, and that in the absence of proof of all of those elements, a conviction of first

degree murder cannot stand; that the case is proven solely by the admissions of defendant, and that as defendant stated that he did not remember hitting deceased, did not know that he hit her, and did not intend to kill her, the evidence is not sufficient to sustain a verdict of murder in 'the first degree.

Great reliance is had upon *People* v. *Kelley*, 208 Cal. 387 [281 P. 609], and *People* v. *Howard*, 211 Cal. 322 [295 P. 333, 71 A.L.R. 1385], and it is argued that in this case, as in those cases, the killing was in the heat of passion aroused by the admissions of deceased as to her conduct, and that this fact necessarily excludes the possibility that the killing was premeditated, willful or with malice aforethought; that in view of the testimony of defendant that he acted in the heat of passion it was incumbent upon the prosecution to contradict this by evidence, which it had failed to do.

In the Kelley case the Supreme Court said that there was ample evidence that the killing was done by the defendant, but that there was nothing in the record from which it might with reason be argued that the injuries were inflicted with that intent or that malice aforethought which is a necessary ingredient of the crime of murder, nor could the court bring itself to believe that there was a willful, deliberate and premeditated killing. But the facts in that case are not like the facts in the case before us. There the injuries from which the victim died were inflicted during a drunken sexual orgy in which the parties were engaged and in which the victim was a willing participant.

In the Howard case the victim of the homicide was engaged in the automobile rental business and defendant was employed by him. They were on friendly terms and lived together in an apartment. Decedent died from the effects of a blow on the head inflicted with a hammer, but the only evidence that said blow had been struck by defendant was his own admission, which was that he had struck decedent during a struggle that ensued when decedent upbraided him for absenting himself from the garage. Defendant contended that the evidence did not warrant a verdict of first degree murder because of the absence of a showing of express malice. The court said, pages 328-329:

"Murder is defined as the unlawful killing of a human

being with malice aforethought. (Sec. 187, Pen. Code.) Such malice may be express or implied. It is express when there is manifested a deliberate intention unlawfully to take away the life of a fellow-creature, and implied when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart. (Sec. 188, Pen. Code.) All murder which is perpetrated by means of poison, or lying in wait, torture, or by any other kind of wilful, deliberate, and premeditated killing, or which is committed in the perpetration or attempt to perpetrate arson, rape, robbery, burglary or mayhem, is murder in the first degree; and all other kinds of murders are of the second degree. (Sec. 189, Pen. Code.) To be murder of the first degree, under our statute, the killing must be premeditated, except when done in the perpetration of certain felonies; that is to say, the unlawful killing must be accompanied with a deliberate and clear intent to take life. If the act be preceded by, and be the result of a concurrence of will, deliberation and intent, the crime of first degree murder is proved. (*People* v. *Bellon,* 180 Cal. 706 [182 P. 420].) When the killing is proved to have been committed by the defendant, and nothing further is shown, the presumption of law is that it was malicious and an act of murder; but in such a case the verdict should be murder of the second degree, and not murder of the first degree. (*People* v. *Knapp,* 71 Cal. 1, 6 [11 P. 793]; *People* v. *Ford,* 85 Cal.App. 258, 263 [258 P. 1111].)''

But it also said that if defendant's confession were disregarded, there was nothing in the record to establish the circumstances of the striking of the fatal blow, and if the jury had rejected defendant's testimony that decedent was the aggressor in a quarrel which led to the homicide, there was no evidence that it was the result of a willful, deliberate and premeditated intent to kill. It said, however, that even if the jury accepted defendant's confession *in toto* the offense was still second degree murder as defendant did not establish such provocation as would excuse the homicide or reduce it to manslaughter; that the commission of the crime by defendant being proved, the burden of proving circumstances of mitigation, or that justified or excused it, devolved upon defendant unless proof by the prosecution relieved him of the burden. (Sec. 1105, Pen. Code.)

Respondent, however, points out that the facts in the Howard case are entirely different from those in the instant case, and relies, instead, upon *People* v. *Murphy,* 1 Cal.2d 37 [32 P.2d 635], and *People* v. *Smith,* 14 Cal.2d 541 [95 P.2d 453]. In the Murphy case defendant, by the use of a belt with a buckle upon it, and his fists, bruised and battered his wife's body and broke her jaws, as a result of which injuries she died some days later. Defendant testified that he was intoxicated at the time these injuries were inflicted upon deceased and that he had no recollection of inflicting them; that he remembered being in the apartment with her, then nothing further until he found himself wandering along the ocean pier. It was there contended that the evidence was insufficient to establish murder in the first degree; that defendant had inflicted the injuries while in a drunken and sexual frenzy, and while incapable of forming a clear, willful, deliberate and premeditated intent to kill. Reliance was there had upon the Kelley case, but the Supreme Court said that in the latter case the injuries inflicted appeared to be the natural result of the orgy engaged in by the parties, and the circumstances tended to show an accidental or unpremeditated killing, but that in the case before it the fatal injuries were deliberately and intentionally inflicted while the defendant was engaged in subjecting decedent to a severe and unjustified beating. It said, pages 40-41:

"Of course, whenever the existence of any particular purpose, motive or intent is a necessary element to constitute any particular species or degree of crime, the trier of the facts in determining whether such purpose, motive or intent actuated the accused in the perpetration of the offense, may properly take into consideration the fact that he was intoxicated at the time. (Authorities *supra.*) However, the weight to be accorded to evidence of intoxication, and whether such intoxication precluded the accused from forming a specific intention to kill and murder, which intent is a necessary element in murder of the first degree, are matters essentially for the determination of the trier of the facts. (*People* v. *Yeager,* 194 Cal. 452, 474 [229 P. 40]; *People* v. *Sainz,* 162 Cal. 242, 245 [121 P. 922].) From an examination of the entire record we cannot say that defendant, by reason of the use of intoxicants, was so disordered mentally at the time of the

attack on decedent as to preclude the resultant killing from being of that 'willful, deliberate and premeditated' character designated in section 189 of the Penal Code as murder in the first degree. It is significant that defendant when on the stand testified in detail as to what transpired immediately before and immediately subsequent to the wrongful assault on the decedent. As to these events his recollection was reasonably vivid. His memory was faulty only as to the period during which the fatal injuries were being inflicted. In view of this the trial court might very properly discount or reject defendant's testimony as to the extent of his intoxication and conclude that defendant was not so inebriated as to be unable to appreciate the character and gravity of his deliberate and wrongful acts.''

The court further said that an affirmance of the judgment need not rest solely on the foregoing reasoning because:

''There are certain kinds of murder which carry with them conclusive evidence of premeditation. These the legislature has enumerated in the statute (sec. 189, Pen. Code) and has taken upon itself the responsibility of saying that they shall be deemed and held to be murder in the first degree. These cases are of two classes. When the killing is perpetrated by means of poison, lying in wait or *torture,* the means used is held to be conclusive evidence of premeditation. When the killing is done in the perpetration or attempt to perpetrate arson, rape, robbery, burglary or mayhem, the occasion is made conclusive evidence of premeditation. (*People* v. *Sanchez,* 24 Cal. 17, 29, 30; *People* v. *Milton,* 145 Cal. 169, 170 [78 P. 549].) If a case falls within either of these classes the statute determines that the killing is wilful, deliberate and premeditated and the trier of the facts has no alternative but to find the offender guilty of murder in the first degree.

''*In our opinion the brutal and shocking treatment to which the decedent was subjected, and as a result of which she died, constituted torture of an aggravated character within the meaning of the statute.* The statute therefore conclusively designates the resulting homicide as murder in the first degree.'' (Italics ours.)

In *People* v. *Smith, supra,* defendant admitted the killing but contended that he was so intoxicated at the time that he did not have the requisite intent to commit the crime of

murder in the first degree. The court said that while the evidence of defendant's intoxication was properly presented to the jury for consideration in determining whether he had the requisite intent, that the jury's verdict showed that the jurors did not believe that defendant was so intoxicated as to prevent him from having the specific intent to kill.

In *People* v. *Bellon,* 180 Cal. 706 [182 P. 420], the court said that it is not necessary that there should be express evidence of a deliberate purpose to kill, but that such purpose may be inferred from such facts and circumstances in the case as would reasonably warrant an inference of its existence, and that the deliberation which must precede a killing in order to make the murder one of the first degree need not have existed for any given length of time. And it was further said, "It is difficult to attribute any other design than that of killing to one who knowingly strikes at the throat of another with a sharp razor with such force and strength as to cause death." And in *People* v. *Knapp,* 71 Cal. 1 [11 P. 793], the court said that in a prosecution for murder, when no considerable provocation for the killing appears, malice is implied; and if the killing is with malice, it is unlawful. Also that where the commission of the homicide by the defendant is proved on the part of the people, and the evidence of the prosecution does not tend to prove the offense manslaughter, or that the homicide was excusable or justifiable, the defendant must prove by a preponderance of evidence that the crime was only manslaughter, or that it was excusable or justifiable.

There is in the case before us no suggestion of any attack by decedent upon defendant or that he acted in any way in self defense. According to his own statement he knocked his wife down when she was standing with the overalls worn over her dress down to her knees. That he thereafter beat her unmercifully, inflicting severe injuries from her head to her knees and on her arms and hands, is obvious; that he sought no medical or other assistance for her until after she had become unconscious is also apparent, though with prompt medical attention she might have recovered. He had previously told the witness Mooney: "I have a good woman, she is contented. If she would trifle on me, and I would catch her with another man, I would kill her and kill him

too. When she don't do to suit me I just give her a damned good beating then she is all right. I take a club.'' That he had previously inflicted injuries upon her by biting her arms when he had her up against a wall choking her was admitted by him to the sheriff after his arrest.

The foregoing was sufficient, we believe, to justify the verdict of the jury, in view of the decisions in the Murphy and Smith cases, *supra*. To be sure defendant contends, as did the defendants Murphy and Smith, that he had no recollection of inflicting the beating upon his wife, and that said beating was done in the heat of passion aroused by the admissions of his wife as to her treatment of their child. But the jury were not compelled to believe defendant's statement of the alleged admissions of decedent, which, indeed, is such as to tax human credulity. It does not seem possible that had decedent been the dissolute and abandoned person he now pictures her to have been, he could have lived with her for six years without having previously had evidence of her depravity. Nor does the testimony show that defendant's sensibilities were such that he would be readily shocked into a state of insensibility. That there had been any intimacy between decedent and the Lemos boy was denied by the latter, and the mother of decedent denied that she had ever told Cardoza anything about her daughter's past, or that the girl had been ''loose'' or had had any trouble. She said that, on the contrary, defendant himself was given to filthy and vulgar talk when she and her husband were present, and in the presence of the Cardoza child. Also, as in the Murphy case, defendant's clear recollection of events up to and immediately after the beating belies his testimony that he did not remember the beating itself.

We are of the opinion that the jury was justified in disregarding defendant's claim that he beat decedent while in a state of mind which rendered him incapable of forming a clear, willful, deliberate and premeditated intent to kill her. We are also of the opinion that the beating by defendant and his subsequent neglect to do anything to relieve his victim constituted torture within the meaning of section 189 of the Penal Code and within the holding in the Murphy case.

The judgment and the order denying a new trial are, and each of them is, affirmed.

Peek, J., and Thompson, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied April 1, 1943.