[Crim. No. 594.  Fourth Dist.  Oct. 26, 1948.]

THE PEOPLE, Respondent, v. JOYCE CHRISTINE
NICHOLS, Appellant.

Philip M. Wagy for Appellant.

Fred N. Howser, Attorney General, and Elizabeth Miller, Deputy Attorney General, for Respondent.

BARNARD, P. J.—The defendant pleaded guilty to a charge of murder. The court found that it was murder in the first degree and this appeal is directed entirely to. the contention that the judgment should be modified by reducing it from one of the first to one of the second degree.

The appellant was a girl 13 years old, living with her father and stepmother near Bakersfield. While returning from school on the afternoon of November 17, 1947, she met a little girl aged 5 years, whom she had never seen before. She took this little girl home with her, where she peeled some potatoes and swept the kitchen floor. No one was at home except her younger brother Jerry, who came in briefly while she was performing these tasks. The appellant then took this little girl to a cave which some boys had dug in a ditch bank, several hundred yards from the Nichols' home. This cave consisted of an open pit from which a short tunnel had been dug, connecting it with another pit which had been covered with lumber and dirt.

While in the covered pit the appellant requested the younger child to remove her clothes, which she did. Appellant then attempted to engage the younger child in sex play, inserting her finger in her private parts, which were severely scratched and distended. The younger girl objected to this and threatened to tell her grandmother whereupon the appellant "slapped her around" and pulled her hair. Because the younger child continued to cry and threatened to tell her grandmother the appellant went out and secured a rock which was either in or near the outer pit. When she returned the younger girl was in the short tunnel bending over, with her

back to the appellant. The appellant hit her on the back of the head twice with the rock, causing her to fall to her knees. At her request the little girl then crawled out to the open pit. She then hit the little girl several times on the head and face with the rock. The little girl then lay still and the appellant dragged her back into the tunnel. The appellant then washed her hands in the canal, went home and changed her clothes which were spotted with blood, spent a normal evening and then went to bed and to sleep.

The body of the little girl was found in the tunnel that evening, and it appears that death had resulted from a fractured skull. The body was discovered by officers who were taken there by some boys, including the appellant's brother, Jerry. Jerry then reported to his father that he had seen the dead girl with the appellant that afternoon. The appellant was awakened by her father whereupon she admitted to him that she had struck the little girl with a rock but told him nothing about the sex play.

Two long talks were had by the officers with the appellant on November 19 and another on November 20, all of which were taken down in shorthand. In the first of these, she told most of the facts stated above but omitted all reference to any attempted sex play. She said she did not know why she hit the little girl, that she was not mad at her, and that she did not know why she wanted her to take her clothes off. When asked: "Did you play with her" she replied "No I don't do things like that."

At the second conversation, later the same day, she said she did not know why she hit the little girl and that she got no thrill out of doing it. When asked when she first decided to do that, she replied: "It just came up like that." She said that she did not have this in mind when she took the little girl to the cave or when she told her to take off her clothes; that she did not know why she wanted her to do that and got no pleasure from it; that she started slapping her and pulling her hair immediately afterward and then hit her; that after slapping her she went and got a rock; that this is when she decided to hit her; that she had never seen her or played with her before; that the little girl did not move after she hit her the last time; that she then dragged her back into the tunnel; that she did not know whether or not she was dead; and that she did not sleep good that night. When asked if during that time she did not think she was "committing some kind of trouble" she replied: "I just did it like that." She

was then asked: "In other words, a feeling came over you and you couldn't help yourself, is that right?" She replied: "Yes."

In the third conversation the next day, the appellant said that she had not played with the little girl's private parts; that right after the little girl took her clothes off she slapped her and started pulling her hair; that the little girl started "bawling" and said she was going to tell her grandmother; and that she did not decide to kill her then. She was then asked: "Did you ever decide to kill her, or did you do it without deciding?" She replied: "I never did decide, it just came in like that and I went outside and got a rock and hit her in the head." She then said that she hit her several times "and she was dead"; that "I got afraid. I didn't even mean to kill her . . . I just meant to take her to play house and stuff like that"; that she did not mean to "slap her around" before they went out there; and that "I had no reason at all. I wasn't mad at her or anything, that is the first time I ever saw her."

At this point one of the officers told the appellant that he did not believe her story and there was no use of her continuing with it, that he knew she played with her own private parts because two doctors had examined her and doctors could tell about this. The appellant then admitted that this was true, that she had taken the little girl out there with the idea of playing with her and that she had put her finger in the little girl's private parts. She then said that when she did this the little girl began to cry and said she would tell her grandmother and she started "slapping her around"; that "She still said she was going to tell"; that she got the rock because she did not want her to tell her grandmother; that she hit her six times, the last two times in the face; that when she took the little girl to the cave she had it in mind to have her take off her clothes and play with her; that when her father questioned her she told him she had killed the little girl but did not tell him she had "played" with her; that she had previously denied the sex part to the officers; and that this was the first time she had told anybody about it. When asked why she got the rock, she replied: "I just saw that out there." She then said that when she saw that the little girl was dead she got scared and started running.

The appellant was sent to the Camarillo Hospital. After 90 days' observation the hospital doctors reported that she had "an educational age" about two years under her actual

age, and that a very early brain damage was indicated; that she had a sadistic tendency with animals; that the episode here in question "may have been in part provoked by increased sex tension preceding her first menstrual period, which occurred within a week after the crime was committed"; and that "She is borderline mentally defective and has emotional and personality deviations of such a serious nature as to jeopardize successful social relationships at the present time. Hereditary, constitutional and environmental factors have all contributed to the development of her pathological reactions, which culminated in the fatal beating of a five year old girl who resisted patient's attempts to engage her in sex play. Patient did not premeditate the murder, nor intend to kill the child, but became terrified by the younger child's screams and beat her trying to scare her into silence. When she realized the child was dead, she concealed the body and with exceptional lack of emotional concern, proceeded about her usual evening routine, showing no evidence of remorse, guilt or apprehension over the possibility of being detected." The report closed with a statement that "She is too dull mentally to benefit from individual psychotherapy" and a recommendation that for the present she be confined in a certain girls' institution.

The juvenile court concluded that the defendant was not a proper subject for further proceedings therein, and after a preliminary hearing she was bound over to the superior court. She was there charged with murder and her present counsel, appointed by the court, has ably represented her through all stages of the proceedings. A plea of guilty was entered and the court took evidence for the purpose of determining the degree of the crime. The only evidence material to this question consisted of the various statements made by the appellant, evidence as to the condition of the deceased's body, and the doctors' reports. The court mentioned the repeated hitting of the deceased with this rock, remarked that "This took some conscious doing on the part of the defendant," and felt compelled to hold that the evidence disclosed that it was first degree murder whether viewed from the standpoint of torture or from the standpoint of deliberation or premeditation. Judgment was entered accordingly, and this appeal followed.

It is first contended that the evidence does not, beyond a reasonable ground of doubt, justify the finding of a killing

by means of torture. It is argued that the evidence indicates no intention to inflict pain for its own sake upon the victim but rather, as regards any specific intent, indicates an intention to silence the victim by beating her. The respondent argues that the appellant by one statement admitted that she intended to beat the little girl when she took her out onto the desert and that this, with the fact that she did beat her and that death ensued, is sufficient to establish that the murder was perpetrated by means of torture, citing *People* v. *Murphy*, 1 Cal.2d 37 [32 P.2d 635] and *People* v. *Cardoza*, 57 Cal.App. 2d 489 [134 P.2d 877].

The statement relied on was made at the close of the second interview above mentioned. When she was asked when she first felt "like you were going to hurt her" the record shows the following:

"A. We got to the desert. We were going around to her house and I saw the desert and it just came to me like that.

"Q. That you would take her out and beat her up? A. Yes."

The statement relied on is merely an affirmative reply to a leading question. It was made at a time when the appellant was concealing the real reason for her attack on the little girl. The officers were then trying to learn the real reason. It clearly appears that the officers did not believe that there was no real reason, or believe that she had decided in advance to take the little girl out and beat her up. That this was not true clearly appeared the next day when the appellant admitted the real reason for the attack. It then appeared beyond any reasonable doubt that an intention to make the attack was not formed in advance but that it came up suddenly and unexpectedly because of the victim's outcries and threats to tell.

The cases relied on in this connection are not controlling here. In *People* v. *Murphy*, there were not only multiple injuries inflicted by a belt buckle and fists but "other treatment of a sordid and shocking nature," which is not described in the opinion. Without going into detail the court stated that the defendant deliberately and intentionally used brutal and shocking means in subjecting the deceased to a severe and unprovoked beating. In *People* v. *Cardoza*, after prolonged ill feeling the defendant unmercifully beat his wife with an axe handle and then let her suffer several hours before calling a doctor. The circumstances clearly show that he was vindictive and that he desired to make her suffer in revenge or as a punishment for what he thought she had done.

In the instant case, there is nothing to indicate any intention to inflict pain upon the victim as a punishment or in revenge, as commonly understood or as intended by the statute. There had been no previous quarrel or ill feeling and the beating occurred as a result of the appellant's sudden and instinctive idea to prevent the victim from telling what had occurred. In our opinion, the torture provision of the statute was not intended to cover such a situation as this. (*People* v. *Bender*, 27 Cal.2d 164 [163 P.2d 8].) In that case, the court said: "The killer who, heedless of the suffering of his victim, in hot anger and with a specific intent of killing, inflicts the severe pain which may be assumed to attend strangulation, has not in contemplation of the law the same intent as one who strangles with the intention that his victim shall suffer." We think the same is true where the killer acts in sudden panic brought about by a sense of shame and fear of discovery. The torture provision of the statute was intended to cover a different sort of situation.

The next question is whether the evidence is sufficient to justify a finding that this killing was deliberate and premeditated. The appellant argues that assuming a specific intent to kill here appears, this is not in itself sufficient to constitute the deliberation and premeditation contemplated by the statute; that the time element and the distances were extremely short; that there was no previous ill will or design to kill or preparation to that end; that the intent to injure or kill was suddenly inspired by the threat of the deceased to tell of appellant's misconduct; that this induced fear, shame, rage or a combination of all three in the mind of appellant which led to her savage attack; and that this cannot be said to have been deliberate or premeditated, within the meaning of the statute. The respondent gives but brief attention to this question, arguing that direct evidence to establish these elements is not required, and that deliberation and premeditation may be inferred from the surrounding facts and circumstances. It is argued that a deliberate and a premeditated purpose on the part of the appellant to kill this little girl, in order to prevent her from telling her grandmother about the abuse to which she had been subjected, could properly be inferred by the court from the facts as shown by the record, and that this evidence is sufficient to support the finding of first degree murder.

It has long been held that in order to constitute murder in the first degree there must be something more than a

malicious or intentional killing, and in order to meet the statutory test for first degree murder there must be a satisfactory showing of a deliberate and preconceived intent to kill. (*People* v. *Holt*, 25 Cal.2d 59 [153 P.2d 21].) In *People* v. *Bender*, 27 Cal.2d 164 [163 P.2d 8], it is pointed out that the mere specific intent unlawfully to take life is normally an element of second degree murder also, and that such specific intent, obviously, is not necessarily the same as the ''willful, deliberate and premeditated'' intent which is essential to constitute murder in the first degree. Also, that ''deliberate'' means something that is unhurried and arrived at as a result of careful thought and the weighing of considerations, including the reasons for and against a contemplated action; that it means just the opposite of hasty, impetuous or impulsive; and that ''premeditate'' means ''to think on, and to revolve in the mind beforehand; to contrive and design previously.''

▮ The elements of ''deliberate'' and ''premeditated'' not only negative the idea of hurried thoughtless action in the face of an unexpected situation, but must be said to reasonably imply some opportunity for careful thought and for the weighing of various considerations as well as the presence of some plan or design. Of course, the length of time available for deliberation cannot be the controlling element. This would vary with different individuals and with differing circumstances. It would seem obvious that the age and experience of the defendant should be considered in this connection. ''The true test is not the duration of time as much as it is the extent of the reflection.'' (*People* v. *Thomas*, 25 Cal.2d 880 [156 P.2d 7].)

Where an adult is involved, the application of these rules and principles to particular facts and circumstances is frequently difficult and the question a close one. ▮ We have here the added circumstance that this crime was committed by a 13-year-old girl, with a mental age of 11, who was mentally and emotionally defective, who had a natural tendency toward cruelty to animals, and who was then going through a period of extreme mental and emotional stress. In our opinion, these are a part of the surrounding circumstances which should not be overlooked. Aside from the other elements mentioned, it is the general policy of the law to take into consideration the inexperience and probable extent of understanding of children of tender years. This is recognized in negligence cases. (*Hoyt* v. *Rosenberg*, 80 Cal.App.

2d 500 [182 P.2d 234, 172 A.L.R. 883].) Section 26 of the Penal Code, in stating who are capable of committing crimes, excepts children under the age of 14, in the absence of clear proof that at the time of committing the act charged they knew of its wrongfulness. While the age and condition of this appellant are not, in themselves, controlling here they are a part of the general circumstances which must be considered with other facts in determining whether the evidence is sufficient to show beyond a reasonable doubt that this killing was deliberate and premeditated, within the meaning of the statute.

The evidence here clearly shows that the appellant did not plan or intend this killing in advance; that the killing resulted from her attempt to meet a situation which unexpectedly developed; that she acted from a sense of shame and with the idea of protecting herself; that she had no real realization of the enormity of her offense; and that there was no deliberation or premeditation within the meaning of the statute. It can be said here as was said in *People* v. *Bender*: ''There is no substantial evidence from which it reasonably can be inferred that defendant either formed or carried out the intent to kill deliberately, and with premeditation, in the ordinary meaning of those words.'' Paraphrasing what was further said in *People* v. *Bender*, the conclusion that this defendant arrived at or carried out the intention to kill as the result of a concurrence of deliberation and premeditation could rest only on conjecture and surmise. Overwhelmingly opposed to such conjecture or surmise, and consistently evidenced by every circumstance, is a clear picture presented by the evidence of a sudden and unexpected development, with a feeling of shame and a fear of discovery, which was followed immediately by a violent killing in a desperate and frantic effort to protect herself by preventing a report of her misconduct. When all of the facts are given their fullest possible effect a reasonable ground of doubt, with respect to the degree of the crime, still remains, and under those circumstances she could be convicted of the lower degree only. (Pen. Code, § 1097.)

The judgment is modified by reducing it to murder in the second degree and, as so modified, is affirmed. The cause is remanded with directions to pronounce judgment accordingly.

Griffin, J., and Mussell, J., concurred.