[Crim. No. 4441. In Bank. July 18, 1944.]

THE PEOPLE, Respondent, v. WILLIAM LEVA HOUGH, Appellant.

Frederic H. Vercoe, Public Defender, William B. Neeley, Deputy Public Defender, and Morris Lavine for Appellant.

Robert W. Kenny, Attorney General, and Frank Richards, Deputy Attorney General, for Respondent.

CURTIS, J.—This is an automatic appeal taken under the provisions of subdivision (b) of section 1239 of the Penal

Code from a judgment of death under an amended indictment charging the appellant with the crime of murder, after a prior conviction of a felony. The original indictment against appellant was in two counts. By count one he was charged with the murder of Inez Hough, wife of the appellant, and by count two he was charged with the murder of Frederick L. Culp. Each of said offenses was alleged to have been committed on the 13th day of June, 1942, in the county of Los Angeles. To this indictment the appellant entered a plea of not guilty to each count and not guilty by reason of insanity. At a later date an amended indictment was filed against him in which he was charged with the same two offenses and also with a prior conviction of a felony. Upon the filing of the amended indictment, the appellant withdrew his former pleas of not guilty and not guilty by reason of insanity, interposed to the original indictment. He thereafter pleaded guilty to the two charges of murder and admitted the prior conviction of a felony as alleged in the amended indictment. The court thereupon set the case for hearing to determine the degree of crime and to fix the punishment. At the conclusion of this hearing the trial judge determined the degree of the crime alleged in each count to be murder in the first degree and imposed upon the appellant the extreme penalty of the law.

The evidence produced before the trial court at this hearing is free from any serious conflict. The appellant and Inez Hough were married on February 2, 1940. He was 47 and she was 35 years of age at the time of her death. It was his fifth marriage and her second. They had known each other about six months before their marriage. They were married in El Paso, Texas, and he brought her to Los Angeles. At that time he was engaged in transporting cars from Detroit, Michigan, to Los Angeles. They first lived at the Stadler Hotel in Los Angeles, but for only a few days, when they moved to Wilmington, California. While living in this latter place, the appellant on one of his trips to the east brought his wife's mother, Mrs. Katie M. Griggs, home with him from Kansas City, Missouri, and the three lived together for some months. In the meantime the appellant had given up transportation work and returned to his former trade of welding and was employed in the shipyards at Wilmington.

During the two years and more of their married life, appellant and his wife frequently had arguments and disagree-

ments of such gravity as to cause their temporary separations. Their differences however were at least for the time adjusted, reconciliations were effected, and they resumed their marital relations as previously carried on. The most serious of these family jars occurred in August, 1941, and deserves special mention as shedding some light upon the question involved in this appeal. They started an argument as to why she had been away when he returned from one of his transportation trips. Appellant went into the bedroom and came out with a jacket over his arm and walked over to his wife and said, "I might just as well kill her now as any time and be done with it." There was a knock at the door and the wife answered it, then ran out of the house and down the street. Appellant with a gun in his hand ran after her. His mother-in-law telephoned the police. Before the police arrived appellant returned, got in his car and followed his wife. He returned in about fifteen minutes, retired to his bedroom, and went to bed. His wife returned with the police who came in and took the gun. It was in a dresser drawer in his bedroom. After this episode the parties separated, and appellant went to live again at the Stadler Hotel in Los Angeles. Mrs. Hough continued to reside at their Wilmington home for about two months when the mother went to live with another daughter and the wife went to work at a rest home.

Even after this violent disturbance of their domestic life, appellant and his wife patched up their differences and took up their residence in Long Beach. It was then that he went to work as a welder. This was about the 1st of December, 1941, according to his testimony. He bought furniture for their apartment at a cost of about $900 and obligated himself to the extent of $700 for jewelry for his wife. However, it does not appear that in their new home they enjoyed any greater domestic felicity than had previously existed in other places where they had lived. Appellant testified that "I and my wife would argue—we would have arguments and I could not take it." Finally, on Easter Sunday, which was April 5, 1942, Mrs. Hough left him. Appellant made numerous attempts to have her return to him. He even had the pastors of two of the local churches intercede with her in an endeavor to effect a reconciliation. The wife refused to be again reconciled or to live with him. She secured employment in a beauty

parlor, and subsequently instituted an action for a divorce. In this action she recovered an interlocutory decree of divorce and an order to show cause why he should not be restrained from molesting her. The appellant testified that about this time and for some months previously, his health began to fail, that he had a number of fainting spells and was sent to hospitals for treatment. Only a few days on each of these occasions were spent by him in the hospitals and the doctors who attended him on these occasions were not of the opinion that his condition was as serious as he appeared to believe it to be.

Appellant returned to Los Angeles and again took up his residence at the Stadler Hotel. He there became acquainted with a Mr. Langley, from whom he purchased a .45 Colt automatic pistol on the afternoon of June 13, 1942. A few days prior to that date he had had conversations with Langley about the purchase of a pistol and stated at the time that if he had one he could get a job. Langley had one, but would not sell it to him as he needed it in his business. However, a day or so before June 13, 1942, he had acquired a second pistol and on that day sold one of them to the appellant at about three o'clock in the afternoon for $32.50, receiving $10 as a down payment. At the same time Langley delivered to appellant a clip containing seven loaded cartridges. At four o'clock of the same day, after drinking a half pint of whiskey, appellant purchased a round-trip ticket from the Pacific Electric Railway Company and left for Long Beach. He took with him the pistol he had bought from Langley and the clip containing the seven loaded cartridges. These were not in the pistol at the time he purchased it from Langley, but appellant inserted the clip with the loaded cartridges into the gun after he boarded the streetcar for Long Beach. On arriving at Long Beach he went to the location of the Y.W.C.A. building, where he knew his wife was staying, and met her as she was coming out of the building. It does not appear just what the appellant did, after arriving at Long Beach before he met his wife. He must have reached Long Beach from Los Angeles between five and six o'clock, and his meeting with his wife, as she came out of the Y.W.C.A. building, was between nine and nine-thirty o'clock of the same evening. After meeting his wife, as just related, the two walked down the street toward the Pacific Electric Station,

and when they were about a half block from the station the wife told appellant that she was to meet a lady friend at the station and she did not want to be seen with appellant. Thereupon the two parted.

Mrs. Hough went to the station where she met her friend, Mrs. Klaproth, who had just arrived from Wilmington accompanied by her daughter and a young man, a friend of the daughter. This meeting took place at about 9:30 p. m. as Mrs. Klaproth stated she left Wilmington on the 9:20 train. Immediately thereafter the four walked down to the Pike, a street on which is located the amusement zone of Long Beach. They walked along the Pike to a point opposite a fortune teller's concession. The two young people left the other two and went over to have their fortunes told. Mrs. Hough and Mrs. Klaproth were left standing on the sidewalk, and while there a gentleman, an entire stranger to the two ladies, by the name of Frederick L. Culp, approached and engaged them in conversation. These three then walked east along the Pike toward the 230 Club, referred to by the appellant as a saloon and situated about a half block from the fortune teller's concession. On their way there they were joined by a second gentleman, who was also an entire stranger to the two ladies, but an intimate friend of Mr. Culp. His name was John C. Parsons. The four continued their walk and entered the 230 Club. Not finding a booth near the entrance of the club, they walked along the bar to the rear of the room and entered a booth in which was located a table with a bench on either side of it. Mrs. Hough and Culp seated themselves on one of these benches and the other couple occupied the bench opposite them. Just as they were seated a waiter came in and wiped off the table and immediately after the waiter left, the appellant stepped up to the entrance of the booth in which the two couples were sitting and began shooting. He fired seven shots, five of which entered the body of Mrs. Hough and two entered the body of Mr. Culp, killing each of them instantly. Each bullet passed through the entire body of the unsuspecting victim. The appellant was overpowered by a couple of bystanders and his gun was taken from him. He was held and turned over to the police. Before he was disarmed he struck his wife on her head two or three times after he had shot her, and evidently addressing Culp,

stated, "This will learn you a lesson, you son of a b———."

On the arrival of the officers the appellant was placed in their charge and taken to the police station in Long Beach. While at the police station, the appellant made the following statements to one of the police officers: "I shot that bastard for being out with my wife." "I told her if she did not come back something would happen." "I came here to kill them and, by God, I sure took care of them." "I would have shot the other man if I had not run out of ammunition." A few minutes later and while at the police station, appellant was asked by another officer whether he knew that his wife was dead and was informed that he (the officer) did not know. Appellant replied, "I hope she is because if she is not, my time is spent in vain." This officer further testified that at this same conversation "he also told me that he had told her three or four months previously that if he ever caught her running around with anybody he would kill her and, whoever it was, that he did not give a damn who it was."

The appellant took the stand and testified at the hearing. He made no denial that he had killed his wife and Culp. He admitted that he saw someone who looked like his wife enter the 230 Club, and that after entering the place, he saw his wife sitting in a booth with a man. But he did not remember aiming the gun, or pulling the trigger, or firing the gun; that he did not remember saying anything, and to quote his own language: "I don't know what happened." He disclaimed any intention of killing anyone when he walked into the place, or when he walked up to the booth in which he found his wife.

He gave as reasons for buying the revolver just before going to Long Beach and taking it with him on his trip that he might get a job as guard and because he was short of money, he thought he could pawn the gun should he need some additional money while at Long Beach. He gave no reason for paying about the last dollar he had for the gun just before his trip to Long Beach, when he thought he might need more money before his return. He further testified to the failing condition of his health, which compelled him to give up his job as welder and seek lighter employment, which the position as guard seemed to promise.

The sole contention of appellant on this appeal is

that the evidence produced on the hearing before the trial court for the purpose of determining the degree of the crimes and fixing the punishment is not sufficient to sustain a conviction of murder in the first degree, but on the other hand it establishes a crime of no greater degree than manslaughter, in that it showed that the act of killing was done in the heat of passion. Appellant would limit the evidence against him to his acts and conduct between the time he first saw his wife with Culp and the time he fired the fatal shots which killed the two of them. His theory appears to be that the sight of his wife entering the club or saloon with a male companion and the two seating themselves at a table within one of the booths so inflamed his mind that he shot and killed them upon this sudden heat of passion, and not with that deliberation and intent which are necessarily elements of the crime of murder.

Were we to limit the evidence in this case as contended for by appellant, there might be some plausible reason in support of the theory advanced by him. But this evidence in order to determine the state of mind under which appellant acted at the time he shot and killed his two victims must be considered with other evidence in the case reflecting his state of mind at the time. This other evidence which must be considered includes, of course, his previous conduct toward his wife, and particularly the threats made by him that if she did not come back to him something would happen, and that if he ever caught her running around with anybody he would kill the two of them; and the statements to the police officers shortly after his arrest, that he shot Culp for being out with his wife, and further to quote his own words: "I came here to kill them and, by God, I sure took care of them"; also his statement later made to an officer, who told appellant that he did not know whether or not his wife was dead, "I hope she is because if she is not, my time is spent in vain." This undisputed evidence as a whole shows without a shadow of a doubt that appellant did not act "upon any sudden quarrel or heat of passion" in the slaying of his wife and her companion, but upon mature deliberation to kill and murder her and whomever he caught her running around with. It would be difficult to imagine a more complete and conclusive case of deliberate premeditated murder.

The entire evidence in this case, as previously outlined, and

without repetition, should be considered in determining the guilt of appellant and the degree of his crime. This would include practically the history of their married life; their relations toward each other after their marriage; their frequent separations; his attempt to use his pistol on one occasion coupled with a threat to kill her; her institution of an action for divorce resulting in an interlocutory decree of divorce against him, and an order to show cause why he should not be restrained from visiting her; his attempts to persuade her to return to him and her refusal to do so; his threats against her if she did not return to him; his purchase of the pistol on the day of the murder, and his immediate departure thereafter for Long Beach where his wife was living; their meeting and separation on that day; his subsequent sight of her as she entered the club with another man; his acts of following them into the club and shooting each of them to death on finding them seated in a booth together; his arrest, and subsequent statements to the police officers, not only admitting that he shot his wife and companion, but that he came to Long Beach for that purpose, and that he shot to kill them.

■ Viewing the evidence as a whole, we are of the opinion that the appellant's intent to kill his wife if she refused to return and live with him was formed at the time he purchased the pistol from Langley, if not long before when he was endeavoring to buy a pistol. This conclusion seems inevitable when considering the entire evidence in the case. The facts in this case are in some respects similar to those in the case of *People* v. *Coleman,* 20 Cal.2d 399 [126 P.2d 349], where this court reviewing the evidence in that case stated its conclusion on page 409 as follows: ''There is here an abundance of credible evidence to support the verdicts of the jury. Even if the jury believed the defendant's testimony that he had no recollection of what transpired after he left Laguna Beach until he awoke in the Coronado jail, there is sufficient in the record to justify the implied finding of the jury that the defendant formed the specific intent before he commenced the trip to San Diego, and that such intent continued to control his act. (*People* v. *Norwood,* 39 Cal.App.2d 503, 505 [103 P.2d 618].)''

The evidence against the appellant is much stronger than that in the case just cited and supports in every respect the order of the trial court in determining the degree of the crime

as murder in the first degree and fixing the extreme penalty as the punishment.

Appellant relies upon the cases of *People* v. *Howard*, 211 Cal. 322 [295 P. 333, 71 A.L.R. 1385] and *People* v. *Kelley*, 208 Cal. 387 [281 P. 609] in support of his contention that the evidence against him in this case is insufficient to show that he was guilty of murder in the first degree, and that under the rule announced and followed by this court in those cases, the facts here show the appellant to be guilty of no higher crime than that of manslaughter. We find nothing in either of those cases that tends in the slightest degree to support this contention of the appellant. The difference between the factual situation in those cases and that now before us is so apparent that we deem it unnecessary to discuss them further.

The judgment is affirmed.

Gibson, C. J., Shenk, J., Edmonds, J., Carter, J., Traynor, J., and Schauer, J., concurred.