Filed 6/26/14  P. v. Harper CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>DAVID LEE HARPER, SR.,<br><br>Defendant and Appellant. | F064498<br><br>(Super. Ct. No. 1245527)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Stanislaus County.  Scott T. Steffan and Dawna Reeves, Judges.

Thea J. Greenhalgh, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Catherine Chatman and Larenda R. Delaini, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Defendant David Lee Harper, Sr., was convicted by jury of attempted murder (Pen. Code,[1] §§ 664, 187, subd. (a)), shooting from a motor vehicle (former § 12034,

---

[1]All further references are to the Penal Code unless otherwise indicated.

subd. (c), now § 26100, subd. (c)), and two counts of assault with a firearm (§ 245, subd. (a)(2)). The jury also found true the special allegations that defendant premeditated and deliberated the attempted murder (§ 189), he personally fired the firearm (§§ 12022.53, subds. (c) & (d), 12022.5, subd. (a)), and he personally inflicted great bodily injury upon a child under the age of five (§ 12022.7, subd. (d)). In a bifurcated court trial, the court found true the allegations that defendant suffered a prior serious felony conviction within the meaning of the three strikes law (§§ 667, subd. (d), 1192.7, subd. (c)), suffered a prior conviction within the meaning of section 667, subdivision (a), and suffered four prison priors within the meaning of section 667.5, subdivision (b). The trial court ultimately sentenced defendant to a total term of 39 years to life plus a consecutive term of 23 years.

On appeal, defendant argues the trial court erred in removing a juror during trial without good cause and further contends his counsel was ineffective for failing to request a jury instruction. We affirm.

## FACTS

As the facts are not in dispute on appeal, we will only briefly recount them here. This case is the result of a drive-by shooting where the victim, a 20-month-old child, was shot and gravely injured. Although disputed at trial, the jury determined defendant was the person who fired the shots. The evidence establishing defendant as the shooter included two eyewitness identifications. The vehicle used in the shooting was distinctive. It belonged to one of defendant's sisters and was normally driven by defendant's brother. Defendant, along with his brother and Roneel Prasad, painted the vehicle in the hours following the shooting. Also, defendant altered his appearance by cutting his hair immediately after the shooting. Additionally, Prasad, who was married to one of defendant's sisters, testified against defendant after being convicted of being an accessory for his involvement in this case. As a result of Prasad's plea to his involvement in the case, he was going to be deported. He stated he did not receive any leniency as a result of his agreement to testify against defendant.

2.

Prasad testified defendant admitted the shooting to him and later sent him several threatening notes while the two were in custody together. He described the notes as "kites," which are messages written on small pieces of paper and used by inmates to covertly communicate with each other. The kites told Prasad to "keep his mouth shut," and indicated he or his family could be harmed. Prasad further testified defendant and his brother approached him shortly after the shooting, defendant brandished a revolver and demanded Prasad give them a ride, and defendant discarded shell casings out the window of the car during the ride.

According to the evidence the intended target of the shooting, Ramiro Serna, fought with defendant two weeks prior and cut defendant's face. Prasad testified defendant had contact with Serna, and the two agreed not to testify against each other in their respective cases. Defendant and his brother also came up with a plan to blame the shooting on James Barrett.

The defense disputed the prosecution's evidence and claimed James Barrett, the boyfriend of defendant's sister, was the shooter. In support, the defense produced evidence that two members of the victim's family identified Barrett as the shooter when shown a single photograph by a defense investigator approximately two years after the shooting. One of the family members had previously identified defendant as the shooter from a photographic lineup. The other eyewitness who identified defendant as the shooter had charges pending against him at the time he came forward with the information regarding defendant. Pursuant to an agreement with the prosecution, he was allowed to enter a plea for a two-year prison term, although his prison exposure was as much as nine years and eight months. Defendant's wife provided defendant with an alibi at trial, although her testimony regarding the alibi and changing his appearance were inconsistent with prior statements she had made to the police. Serna denied defendant was the one who shot at him. He further denied cutting defendant's face two weeks earlier, although he admitted to pleading guilty to that offense. A handwriting expert testified the kites Prasad identified as being authored by defendant were written by at

3.

least two different individuals, or possibly three. Additionally, the defense challenged Prasad's credibility, arguing he was not telling the truth about his conversations with defendant, and theorizing he could have written the kites to gain favor with the district attorney's office.

Although the jury heard approximately 10 days' worth of testimony and was tasked with deciding several charges and enhancements, the jury returned its guilty verdicts after approximately two and one-half hours of deliberations.

## DISCUSSION

## I.      The Removal of Juror No. 7 Was Harmless

Defendant argues at length that the trial court's removal of Juror No. 7 after learning a member of defendant's extended family had contact with the juror constituted error. He claims the trial court failed to conduct an adequate inquiry into the matter, and its reasons for excusing the juror were insufficient.

### *Background*

Near the end of trial, the prosecutor informed the court and defense counsel that she had just been made aware of a telephone call between defendant and Millie Garcia.[2] This call took place the evening before and had been tape-recorded. She had not listened to the tape at that time; however, she had been informed defendant may have made some admissions during the call.

In addition, the prosecutor informed the court that a member of defendant's family, Anthony,[3] had been observed having a conversation with Juror No. 7 before the proceedings that morning by Investigator Kirk Bunch. Bunch explained that on his way to court, he observed Anthony speaking with Juror No. 7. After learning this

---

[2]She is alternatively referred to as Millie Harper and Millie Garcia in the record. Due to the confusion, we will refer to her as Millie throughout the remainder of the opinion. No disrespect is intended.

[3]According to the record, Anthony is Millie's son. Millie is the wife or girlfriend of defendant's brother.

information, the court held a closed hearing to inquire into the matter with the juror and the investigator.

During the hearing the court described Anthony to Juror No. 7, who then stated he "asked me for a cigarette and I gave him a couple of cigarettes. That's it." Juror No. 7 explained she had been in her truck, parked outside of the courthouse, and was taking her insulin when Anthony approached and asked her for a cigarette because "he knows I smoke." When asked how Anthony would know Juror No. 7 smokes, she explained he had seen the jurors smoking previously.

Regarding the contact, Juror No. 7 stated it was very brief and consisted of him asking for the cigarette and Juror No. 7 telling him the brand she smoked. The record is unclear as to whether the conversation took place while she was inside of her truck or after she had exited. After she exited her truck, she entered the courthouse. When asked if Anthony was "smoking his cigarette that you gave him near you," the juror replied, "He was up against the wall." She believed Anthony entered the courthouse behind her but she was not sure.

At the time of the contact, Juror No. 7 did not know Anthony was a member of defendant's family, although she had seen him in the courtroom. Juror No. 7 denied having any further conversation with Anthony or smoking a cigarette with him. During the inquiry Juror No. 7 mentioned Anthony had asked her for a lighter on a previous occasion. She explained she often goes outside to smoke with another juror on breaks, but she had not noticed Anthony outside when she was smoking. On the prior occasion when he asked her for a lighter, there was no further conversation. Juror No. 7 stated she had never discussed the case with Anthony.

Subsequently, the court inquired of Investigator Bunch regarding what he had observed. He noted the two were talking and laughing as he walked by into the courthouse. The two then followed each other into the courthouse. He did not observe any cigarettes when he walked by. He explained his observation was brief, but he did notice the two interacting with each other and laughing. He could not hear the content of

the conversation. He did not see any cigarettes or exchange of cigarettes, although that could have happened before he saw them. When questioned further regarding the details of the interaction between the two, Bunch explained he first saw Anthony talking and then Juror No. 7 interacting and then the two laughed.

During the hearing the prosecutor also questioned Bunch regarding a recorded jail telephone call which took place between defendant, Millie, and Anthony. Bunch explained he reviewed a copy of the recording he had received. During the call, defendant attempted to describe a juror with whom he had been making eye contact and exchanging gestures. It appeared defendant was attempting to identify the juror to Anthony. When the prosecutor asked Bunch to relay the physical features of the juror defendant had described to Anthony, the court interrupted the questioning and explained its

> "concern is not with whether or not [defendant] thinks that some of the jurors—one, two or more of them, are on his side. My concern is more that a member of the defendant's family has made, on two occasions, contact with a juror member. I wanted to hear the nature of the conversations so that I could know if there was something being said about a juror trying to contact a juror, or anything like that. Was there any conversation about anyone trying to contact a juror?"

Bunch responded "No, ma'am."

At this point the prosecutor explained that her

> "concern is that if there was a conversation between [defendant] and Anthony, just last night, about whatever they think about whatever juror, and [defendant] describes the juror to Anthony in a way where now Anthony knows who he thinks might be on their side or whatever, I don't care if she is or not, my point is then Anthony is now making contact with somebody he believes is going their way, and I think with a malicious intent to sway that juror. Whether it's to gain some sort of favor or common ground because they both smoke, share a laugh, whatever it is, it's improper and it's an attempt to bias a juror. And that's why I wanted the physical description given by [defendant], because he could be describing somebody else that doesn't even have to do with Miss—well, juror number seven, for the record. And that's my concern. And if that's happening, then what's going on here is a direction without spoken words. And maybe it's not coming from [defendant], maybe it's coming from Anthony, but

6.

regardless of where it's coming from, it should not happen. And I'm deeply concerned now that she is both tainted and there's been an attempt to sway her or bias her in a particular direction, and I think she should be removed.

"And not only that, it appears from investigator Bunch's accounting of what he observed, granted he did not hear content, that there's a difference in facts than what the juror has now told us. And I don't blame her if there is a difference, I'm saying she's probably feeling really uncomfortable, and—but she clearly did not say, you know—it appeared to me, and maybe we could clarify with her, that she just gave him a cigarette, he lit up a cigarette and went and stood by the wall, and that's not what we're hearing happened here."

Subsequently the court gave its tentative ruling, noting Anthony had been present in court every day since the beginning of trial. The court explained,

"My concern, if he is a member of [defendant's] family, is that he's attempting to make contact with our jurors. And I think even an ordinary citizen, having not been instructed not to, would know that's improper. I'm not really, at this point, not having heard the conversation, real concerned about the connection between the call and this juror. My concern is that we've got a member of the defendant's family attempting to make contact with the jurors on more than one occasion. He does not appear to be a gentleman who's in need of a cigarette, in my view. He comes to court everyday in a suit, he's here on time every time. He could ask anybody else on the sidewalk for a cigarette or a lighter. I don't know why he's approaching our juror or jurors. I do think that's improper. And my tentative ruling is to excuse the juror, admonish that—admonish or banish him from the courtroom, 'cause I don't want this to happen again."

Defense counsel objected to the removal of the juror, arguing "this doesn't reach the bias sort of standard that we use for removing jurors." The court stated: "My concern is his twice now approaching the juror, and that's what she said. She said that he asked her for a cigarette today and on a prior occasion asked her for a lighter. That's not proper. And I can't have that going on." The court stated it would remove Juror No. 7 and replace her with a randomly selected alternate.

Defense counsel once again objected, stating she did not "think this was an appropriate reason to replace number seven, and my concern is that this is being done because there are conversations overheard where people thought that the prosecution

7.

thought that maybe juror number seven was on the defense side and I will make—end my comments with that." In response, the court noted,

> "We haven't yet heard the conversation in its entirety. I've indicated that I'm not concerned about whether or not [defendant] feels that he's got juror number four or seven or eight, or whoever it is, on his side. My concern is that there's a member of the [defendant's] family attempting to make contact with the jurors. And if that juror has been twice contacted by him, what she indicates as a conversation does not appear to be the same that Investigator Bunch says that he saw. I don't know which is accurate, but the fact of the contact remains, and one of them went unviewed. I don't know if there's any other members of the jury that he's attempted to contact, but if the rule is if you contact a juror and the juror's going to be gone, perhaps we won't have this problem again. I can't take the chance that they're out there talking about the case or that he's going to try to approach her again or something like that. So she's going to be released. I understand your concern, but I can't have members of the audience contacting the juror. That's not proper."

Juror No. 7 was returned to the courtroom where the court asked a few clarifying questions, then informed her she would be released. The court explained the juror was not being faulted for the contact. Juror No. 7 was replaced with an alternate juror.

*Analysis*

While a defendant has a fundamental constitutional right to be tried by a fair and impartial jury (*Irvin v. Dowd* (1961) 366 U.S. 717, 722), that right does not entitle a defendant to a jury composed of any particular individuals. (*People v. Hamilton* (1963) 60 Cal.2d 105, 128, disapproved on other grounds in *People v. Daniels* (1991) 52 Cal.3d 815, 866 and *People v. Morse* (1964) 60 Cal.2d 631.) Indeed, section 1089 allows for the removal and substitution of a juror for "good cause." Removing a juror pursuant to section 1089 "does not offend constitutional proscriptions." (*People v. Collins* (1976) 17 Cal.3d 687, 691, superseded by statute on other grounds in *People v. Boyette* (2002) 29 Cal.4th 381, 462.) "We review a trial court's decision to discharge a juror under an abuse of discretion standard, and will uphold such decision if the record supports the juror's disqualification as a demonstrable reality." (*People v. Wilson* (2008) 43 Cal.4th 1, 26, citing *People v. Barnwell* (2007) 41 Cal.4th 1038, 1052-1053.)

Defendant argues the trial court violated section 1089 by removing the juror in this case, as the record does not demonstrate the juror committed any misconduct or was biased in any way. Defendant further argues the trial court erred in failing to make an adequate investigation into the matter.

We need not determine whether the trial court erred in dismissing Juror No. 7 because even if we were to find error, we find no prejudice. In *People v. Howard* (1930) 211 Cal. 322, disapproved on other grounds by *People v. Thomas* (1945) 25 Cal.2d 880, 905 and *People v. Sheran* (1957) 49 Cal.2d 101, 108, our Supreme Court found replacing a juror with an alternate did not constitute prejudicial error even though the substitution violated section 1089 at the time. The court noted the substitution was "an irregularity which in no way substantially affected the defendant's rights." (*People v. Howard*, *supra*, at p. 325.) The court explained the alternate juror participated in the same voir dire proceedings, was subjected to the same challenges, and took the same oath as the other jurors. Therefore, the court could assume the defendant did not find the alternate objectionable and was satisfied the alternate could be fair and impartial should he be substituted for one of the other jurors. (*Id*. at pp. 324-325.) Consequently the court found no prejudice in the substitution. (*Ibid*.)

Indeed, as one court has stated, "It is long-established law in California that where an alternate juror, approved by defendant in voir dire, is allowed to deliberate on the jury panel, the defendant bears a heavy burden to demonstrate that he was somehow harmed thereby." (*People v. Hall* (1979) 95 Cal.App.3d 299, 307; see *People v. Hamilton*, *supra*, 60 Cal.2d at p. 127; *People v. Bowers* (2001) 87 Cal.App.4th 722, 735-736 [error in excusing juror without good cause is reversible only if defendant is prejudiced thereby].)

Defendant argues he was in fact prejudiced by the dismissal of Juror No. 7. He claims that "although no specific evidence was elicited that Juror No. 7 favored the defense, such concern was certainly the prosecution's worry." The prosecutor "implied there was a danger the juror had been swayed or biased because the non-juror contact was someone who was a part of [defendant's] extended family." In support defendant relies

9.

upon *People v. Hamilton*, *supra*, 60 Cal.2d 105 and *People v. Hernandez* (2003) 30 Cal.4th 1. We find both cases distinguishable.

In *People v. Hamilton*, the Supreme Court found the removal of the juror during the penalty phase of trial was without good cause as there was no basis for concluding her conduct demonstrated misconduct or an inability to perform her duties. As such, the juror's dismissal violated section 1089. (*People v. Hamilton*, *supra*, 60 Cal.2d at p. 126.) The court subsequently considered whether the dismissal was prejudicial. After reviewing cases determining the erroneous removal was harmless, the court explained there was no showing in those cases the removed juror was "more favorable to one side or the other." (*Id*. at p. 127.) However, the situation was quite different in *Hamilton* where the removed juror "'had disclosed her opposition to a verdict imposing the death penalty.'" (*Id*. at p. 128.) Consequently, her removal was obviously prejudicial to the defense. The court explained:

> "While it has been said repeatedly, in the cases cited above, that a defendant is not entitled to be tried by a jury composed of any particular individuals, but only by a jury composed of qualified and impartial jurors, this does not mean that either side is entitled to have removed from the panel any qualified and acting juror who, *by some act or remark made during the trial, has given the impression that he favors one side or the other*. It is obvious that it would be error to discharge a juror for such a reason, and that, if the record shows (as it does here), that, based on the evidence, that juror was inclined toward one side, the error in removing such a juror would be prejudicial to that side. If it were not, the court could 'load' the jury one way or the other." (*People v. Hamilton*, *supra*, 60 Cal.2d at p. 128, italics added.)

In *People v. Hernandez*, *supra*, 30 Cal.4th 1, the court addressed whether the erroneous dismissal of a juror pursuant to section 1089 and the substitution with an alternate would bar a retrial. The Court of Appeal had determined the removal of the juror was prejudicial to the defense. On review by the Supreme Court, the court "for purposes of … review" accepted the appellate court finding regarding prejudice. (*Hernandez*, at p. 4.) However, the court did explain the appellate court's ruling was based on the removal of a juror "'who seemed inclined to give serious consideration to

10.

the testimony of the defense witnesses.'" (*Id*. at p. 10.) Thus, the court upheld the appellate court's ruling that the removal was prejudicial.

Our review of other cases requiring reversal due to an error from improperly dismissing a juror all demonstrated facts in which the prejudice to the defense from removing the juror was obvious. (See, e.g., *People v. Wilson* (2008) 44 Cal.4th 758, 813-814, 841 [removal of sole holdout juror for life sentence in penalty phase of trial found prejudicial]; *People v. Cleveland* (2001) 25 Cal.4th 466, 486 [error in removing deliberating juror prejudicial where evidence showed juror was in favor of acquittal]; *People v. Delamora* (1996) 48 Cal.App.4th 1850, 1856 [error in removing jurors prejudicial where jury was deadlocked prior to removal but quickly reached verdict to convict after substitution with alternate jurors].)

Unlike the situations in *Hamilton* and *Hernandez*, there is no evidence on the record demonstrating Juror No. 7 favored one side or the other. Indeed, Juror No. 7 never expressed any sentiments about the case whatsoever. Defendant's argument seems to be centered upon the fact the prosecutor asked that Juror No. 7 be removed because of the fear she had been biased by the contact with defendant's family member. But there was absolutely no evidence on the record indicating Juror No. 7 preferred one side over the other. There is no indication on the record Juror No. 7 ever made any comments or engaged in any nonverbal behavior indicating a preference for one side. There was some minimal discussion regarding the telephone call between defendant and Anthony regarding defendant's efforts to describe a juror. But there was no evidence as to whether that juror was favorable to one side, any evidence as to why defendant may have believed the juror favored one side, or any evidence as to who that juror was. While there was some evidence as recounted from listening to the telephone call that defendant had made eye contact with a juror, there was no evidence presented as to which juror that was, nor any evidence establishing the juror leaned to one side or the other. Thus, any argument that Juror No. 7 expressed an inclination as to one side or the other in this case is completely unsupported by the record and would consist of pure speculation.

11.

Rather, this case is more similar to *People v. Abbott* (1956) 47 Cal.2d 362, which was cited in *Hamilton*. There, during trial, the court learned one of the jurors worked at the same office as the defendant's brother. The two worked in close physical proximity. (*Id.* at p. 370.) As a result, the court inquired of the juror, learning that although the juror worked near the defendant's brother, he had never spoken to the brother and did not know who he was until he was pointed out in court. (*Id.* at pp. 370-371.) He stated he had never discussed the case with anyone and believed he could be fair and impartial; he did not want to be relieved from the jury. The trial court removed the juror due to the proximity at work between the juror and the defendant's brother and to save the juror from embarrassment or criticism. (*Id.* at p. 371.) Initially the Supreme Court found the removal of the juror was for good cause, but further declared there was no prejudice to the defendant from the removal of the juror and the substitution with an alternate. (*Id.* at pp. 371-372.) The court explained the alternate was fully examined and accepted by both sides, was part of the jury since the beginning of trial, and there was no claim he could not render a fair verdict. (*Ibid.*)

Likewise here, the alternate juror was examined and accepted by both sides, was a member of the jury from the beginning of trial, and defendant does not claim the alternate was biased in any way against either side. Importantly, there was no evidence Juror No. 7 in any way favored one side, nor was there any evidence the substituted alternate was anything but fair and impartial. As such, we find no prejudice from the removal. (See *People v. Cleveland*, *supra*, 25 Cal.4th at p. 486; *People v Bowers*, *supra*, 87 Cal.App.4th at pp. 735-736.)

To the extent defendant argues the error also violated his constitutional right to a jury trial, we reject his claim. Defendant's entire argument relies upon a brief citation to two cases, *Downum v. United States* (1963) 372 U.S. 734 (*Downum*) and *Crist v. Bretz* (1978) 437 U.S. 28, 35-36 (*Crist*). Both cases dealt with the dismissal of an entire jury panel without good cause and without reaching a verdict. (*Downum*, *supra*, at p. 735; *Crist*, *supra*, at pp. 29-30.) In both instances the Supreme Court found the empanelling

12.

of a new jury after the first had been discharged without reaching a verdict to be a violation of double jeopardy. (*Downum*, *supra*, at pp. 737-738; *Crist*, *supra*, at pp. 35-38.)

However, our Supreme Court has held the dismissal of a single juror and replacement with an alternate does not implicate double jeopardy concerns. (*People v. Hernandez*, *supra*, 30 Cal.4th at pp. 10-11.) The court explained the right the high court sought to protect in *Crist* was the right of "'an accused in retaining a chosen jury.'" (*Id.* at p. 8, quoting *Crist*, *supra*, 437 U.S. at pp. 35-36.) The court explained that right was not violated when the "defendant's chosen jury was not discharged but instead, with the substitution of a preselected alternate juror, remained intact until a verdict was rendered." (*People v. Hernandez*, *supra*, at p. 9.) In reaching this conclusion, the court relied upon *People v. Burns* (1948) 84 Cal.App.2d 18.

In *Burns*, the court addressed the situation where a court improperly dismissed a juror pursuant to section 1089. The defendant claimed the dismissal of that juror, in violation of section 1089, caused him to be placed in front of two different juries, thereby implicating the double jeopardy clause. In rejecting the claim, the court explained:

> "[A] verdict by 12 jurors, one of whom was originally an alternate juror, is the verdict of the jury originally sworn to try the case. If the substitution of the alternate for one of the regular jurors is in accordance with the provisions of … section 1089 no question of double jeopardy would arise. This can only be true if the substitution of the alternate for the regular juror does not destroy the unity of the jury. It does not destroy the unity of the jury because the jury is not complete until the alternate is accepted and sworn and the alternate is at all times a potential member of the regular jury. [¶] The requirement of trial by one jury is satisfied, where a jury composed of 12 regular jurors and one or more alternates has been impaneled, if the verdict is returned by 12 jurors sworn to try the case although one or more alternates may be included in the jury which renders the verdict. If this is true where the substitution has been made in the manner provided by … section 1089 it must be true where it has been made in an irregular manner. The same number of jurors sworn to try the case in the same way are involved in either instance. Either the substitution of an alternate for a regular juror destroys the unity of the jury or it does not. If it does not destroy the unity of the jury …, then the substitution of an alternate for a regular juror in an unauthorized manner does not place the

13.

defendant twice in jeopardy but is merely an error of law which should not lead to a reversal in the absence of a showing that it has resulted in a miscarriage of justice under article VI, section 4 1/2 of the Constitution." (*People v. Burns*, *supra*, 84 Cal.App.2d at pp. 32-33.)

As the *Burns* court explained, a defendant's right to the original jury sworn to try the defendant's case is not destroyed by the substitution of an alternate. This principle was reaffirmed in *People v. Hernandez*, *supra*, 30 Cal.4th at page 9. Therefore, we find no violation of defendant's right in retaining his chosen jury through the substitution of an alternate juror here.

## II.     Defendant Was Not Denied Effective Assistance of Counsel

On the first day of trial, the prosecution moved in limine to admit the threatening kites authored by defendant while in jail. The defense sought to exclude the writings, claiming the prosecution had not authenticated the writings. Specifically, the defense argued the kites "appear to have been authored by at least two different individuals," and the kites had never been examined by a handwriting expert.

In addressing the issue in limine, the trial court inquired as to whether the prosecutor would be able to lay the proper foundation for the admission of the kites. The prosecutor indicated she would, arguing the "foundation can be laid though Roneel Prasad in terms of writing and the receipt thereof. The content would speak for itself." She further explained "the authentication of handwriting can be done by a lay person and lay opinion, it doesn't require expert testimony, and that's well-settled case law." Defense counsel disagreed, contending the prosecutor could not properly authenticate the writings through a lay witness in this case. The court explained it wanted to determine whether an Evidence Code section 402 hearing was going to be necessary on the matter rather than simply allowing the prosecutor to attempt to lay the foundation during trial and then ruling on the issue with a proper objection. Defense counsel noted her in limine motion outlined the issue and informed the court she would seek a formal Evidence Code section 402 hearing where she could present testimony from her expert on the matter. The court explained that any hearing could be conducted the following day.

14.

The following day, defense counsel presented her expert, Marcel Matley. After his expertise was established, Matley opined the kites he reviewed were written by two different people, and possibly as many as three or four. The prosecutor asked that defense counsel provide a report from Matley since she had not been provided one as of that time. The prosecutor asked if the court had determined whether the kites would be admitted, and the court stated that as it had not yet heard all of the arguments, the matter would be deferred until a later time. As such, the parties were instructed not to mention the writings in their opening statements or during evidence until the court had time to rule on the issue.

During the presentation of the evidence, the prosecutor asked Prasad if he recognized the contested kites. After responding he did, defense counsel objected and the parties discussed the matter off the record. Subsequently, out of the jury's presence, the court conducted an Evidence Code section 402 hearing to determine the admissibility of the kites. During the hearing, Prasad testified he was familiar with defendant's handwriting from being housed with him at the jail when they would stay up and work on the case. Additionally one of the kites was signed "young Dav," which is how defendant referred to himself. Defense counsel argued the kites should not be admitted because her retained expert had opined they were written by two or more people, therefore, the evidence was not "reliable." At the end of the hearing, the trial court concluded the documents had been adequately authenticated by the prosecution and were, therefore, admissible.

Subsequently, defense counsel moved for a mistrial, arguing the prosecutor committed misconduct by eliciting the evidence regarding the kites, and the trial court abused its discretion by admitting the kites. The motion was denied as was defendant's writ to this court that reiterated the same arguments. (*Harper v. Superior Court* (Feb. 25, 2011) F061824.) Defendant now abandons these arguments on appeal and instead argues his counsel was ineffective for failing to request an instruction that the jury was required

to disregard the kites unless it first found defendant was in fact the author of the kites. We find no error.

Defendant's contention centers upon his counsel's failure to request an instruction informing the jury it must first determine the preliminary fact of the authenticity of the kites before it could consider the kites as evidence against defendant. While a trial court is under no duty to give such an instruction sua sponte, it is required to give such an instruction upon request. (Evid. Code, § 403, subd. (c)(1); *People v. Lewis* (2001) 26 Cal.4th 334, 362-364.) Indeed, Evidence Code section 403, subdivision (c)(1) provides that where the admission of evidence is dependent upon proof of a preliminary fact, upon admission of the evidence, the court "[m]ay, and on request shall, instruct the jury to determine whether the preliminary fact exists and to disregard the proffered evidence unless the jury finds that the preliminary fact does exist." Here Evidence Code section 403 clearly applies to the preliminary fact of the authenticity of the kites. Had defense counsel requested an instruction pursuant to this section, the court was required to provide it. The question this court must address is whether counsel's failure to request such an instruction constituted ineffective assistance of counsel. We conclude it did not.

"Under both the Sixth Amendment to the United States Constitution and article I, section 15, of the California Constitution, a criminal defendant has the right to the assistance of counsel." (*People v. Ledesma* (1987) 43 Cal.3d 171, 215.) To establish ineffective assistance of counsel, "'a defendant must show both that his counsel's performance was deficient when measured against the standard of a reasonably competent attorney and that counsel's deficient performance resulted in prejudice to defendant….'" (*People v. Lewis* (2001) 25 Cal.4th 610, 674.) However, "a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies.… If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." (*Strickland v. Washington* (1984) 466 U.S. 668, 697.) Here we need not decide whether counsel provided

16.

ineffective assistance as we find defendant has failed to demonstrate any prejudice from the alleged error.

In order to demonstrate prejudice, defendant must show that it is reasonably probable he would have received a more favorable result had his counsel requested the instruction. (*People v. Lewis* (1990) 50 Cal.3d 262, 288.) Defendant cannot show prejudice where, as here, the instructions adequately informed the jury regarding the authenticity of the kites.

We note there are situations where the necessity of determining a preliminary fact is so clear that an instruction on the issue is unnecessary. Indeed, the comment to Evidence Code section 403 by the Assembly Committee on the Judiciary states:

> "Frequently, the jury's duty to disregard conditionally admissible evidence when it is not persuaded of the existence of the preliminary fact on which relevancy is conditioned is so clear that an instruction to this effect is unnecessary. For example, if the disputed preliminary fact is the authenticity of a deed, it hardly seems necessary to instruct the jury to disregard the deed if it should find that the deed is not genuine. No rational jury could find the deed to be spurious and, yet, to be still effective to transfer title from the purported grantor." (Assem. Com. on Judiciary com., 29B pt. 1B West's Ann. Evid. Code (2011 ed.) foll. § 403, p. 21; cf. *People v. Simon* (1986) 184 Cal.App.3d 125, 130, fn. 3 [in cases admitting prior act evidence where defendant contests committing prior acts "it is generally unnecessary to instruct the jurors that if they believe the defendant, the prior act evidence should be disregarded; clearly if the defendant cannot be connected to the prior act, admission of evidence concerning it will not normally prejudice him."].)

Likewise here, where the issue as to the author of the kites was hotly contested, it is highly unlikely the jury did not understand it must first determine whether defendant wrote the kites before considering them as evidence against him. Defense counsel challenged the authenticity of the kites by bringing in an expert to say they were written by more than one person. Additionally, defense counsel cross-examined Prasad on the issue of the authenticity of the kites, challenging his testimony that all the kites came from the same person. Defense counsel also challenged Prasad's familiarity with defendant's handwriting. Defense counsel pointed out Prasad had access to the discovery

17.

in the case and therefore knew the details and could have written the kites himself. During closing argument, defense counsel challenged Prasad's ability to recognize defendant's handwriting and pointed out the expert's testimony that the kites were written by at least two different individuals. She further argued Prasad lied when he said the kites were written by defendant. Counsel hypothesized Prasad had in fact written the kites on his own to deflect attention from himself and to gain favor with the district attorney's office. In response, the prosecutor challenged the expert's opinion regarding the kites, explaining he had never compared the kites to any known handwriting exemplars to say who wrote them. In addition, the prosecutor pointed out a document found in defendant's cell had examples of different handwriting styles on it and also used language similar to that found in the kites.

It is apparent from the trial testimony and closing arguments that the defense challenged the authenticity of the kites. In doing so, counsel alerted the jury to its argument the kites were not written by defendant. Although no specific instruction was given telling the jury it could only consider the kites if it first determined they were written by defendant, this was apparent through the arguments. (*People v Marshall* (1996) 13 Cal.4th 799, 833-834 [finding "no possibility the jury could have misunderstood its obligation to assess the relevancy of the reconstruction photographs" where counsel argued reconstruction photographs inaccurately displayed conditions].)

Furthermore, several instructions alerted the jury it must first determine whether defendant authored the kites before considering them against him. The jury was specifically instructed that it "heard evidence that the defendant made oral or written statements before the trial. *You must decide whether the defendant made any of these statements in whole or in part*. If you decide that the defendant made such statements, consider the statements along with all the other evidence in reaching your verdict." (Italics added.) The jury was further instructed that if "the defendant tried to hide evidence or discourage someone from testifying against him, that conduct may show that he was aware of his guilt. *If you conclude that the defendant made such an attempt*, it is

18.

up to you to decide its meaning and importance. However, evidence of such an attempt cannot prove guilt by itself." (Italics added.) Moreover, the jury was instructed that if it determined there was a "conflict in the evidence, you must decide what evidence, if any, to believe." The jury was also fully instructed regarding how to evaluate the credibility of witnesses, how to evaluate both lay and expert opinion, and the requirement of corroboration of accomplice testimony should it find Prasad was an accomplice.

The instructions as a whole plainly told the jury it had to decide whether the kites were written by defendant and that if it determined the kites were written by him, it could consider them with the other evidence. In *People v. Lewis*, *supra*, 26 Cal.4th 334, our high court held there was no sua sponte duty to instruct the jury that it must disregard evidence where it found the preliminary fact untrue. In reaching that conclusion, the court explained such an instruction "would merely have told the jury the obvious: that if it found [the witness] could not perceive or recollect, … then the jury should disregard his testimony. Our faith in the common sense of jurors weighs against requiring a trial court to give such instruction sua sponte." (*Id*. at p. 362.) The court further rejected the defendant's alternative ineffective assistance of counsel claim as there was "no reasonable likelihood of prejudice in that the instructions would not have provided necessary guidance to the jurors." (*Id*. at p. 363.)

Likewise here, we conclude the instruction defendant now seeks would have done nothing more than state the obvious: Before the jury could consider the writings as evidence against defendant, it would have to determine they were authored by him. Given defense counsel's cross-examination on the subject, the presentation of an expert witness stating the kites were not written by the same person, and her argument that the kites were not written by defendant, the jury could not have missed the point. In addition, the jury was expressly told it must determine whether statements attributed to defendant were made by him before considering the statements. Given the evidence, arguments, and instructions as a whole, there is no reasonable possibility the jury failed to understand the necessity of determining the kites' authenticity before considering the

19.

evidence. Thus, defendant was not prejudiced by the failure to request any additional instruction on the matter. (See *People v. Smithey* (1999) 20 Cal.4th 936, 985-987 [no prejudice from failure to request a pinpoint instruction where jury was adequately instructed as to the relevant law]; *People v. Castillo* (1997) 16 Cal.4th 1009, 1014–1017 [rejecting claim of ineffective assistance where counsel did not request pinpoint instruction where instructions as a whole were not misleading and did not hinder defense argument].)

To the extent defendant argues he was prejudiced because the jury was not instructed it was required to find the proof of the preliminary fact beyond a reasonable doubt, he is mistaken. The proper standard as to the proof of a preliminary fact is by a preponderance of the evidence. (*People v. Marshall*, *supra*, 13 Cal.4th at pp. 832-833; *People v. Herrera* (2000) 83 Cal.App.4th 46, 61; *People v. Simon*, *supra*, 184 Cal.App.3d at p. 134.) Thus defendant's arguments the instructions failed to adequately state the burden of proof are inapplicable.

Finally, we reject defendant's assertion the jury could have somehow shifted the burden of proof to the defense. The jury was fully instructed regarding the proof beyond a reasonable doubt standard and the People's burden of establishing the offense beyond a reasonable doubt. Additionally, both the prosecutor and the defense informed the jury during closing arguments that the burden of proof rested solely with the prosecution.

During closing arguments, the prosecutor stated: "*I want to stress upon you that I have the burden of proof.* And I take that very seriously. I don't shrug that off, I don't pass that to anyone else. As I stand here before you today, I accept that responsibility of proving each and every count and allegation beyond a reasonable doubt against [defendant]." (Italics added.) She reiterated this later, noting she "accepted the responsibility that [the elements] must be proven beyond a reasonable doubt." Again, in her rebuttal argument, the prosecutor stated, "*I have the burden of proof in this case.* And that is why I get to do a rebuttal argument, because that burden rests on me to prove this case beyond a reasonable doubt." (Italics added.) Defense counsel also noted during

her closing that the People bore the burden of proof. Nothing in the instructions either singly or as a whole would lead the jurors to conclude it was the defense's burden to disprove authenticity of the writings. While the defense disputed the authenticity through the cross-examination of Prasad and the presentation of Matley's testimony, the burden of proof was squarely and repeatedly placed on the prosecution. Defendant points to nothing in the record nor makes any argument demonstrating how the jury would have shifted to the defense the burden of proof on the issue. Based on the instructions as a whole, we find no such reasonable probability exists. Therefore, defendant's claim must be rejected.

## DISPOSITION

The judgment is affirmed.

_____
PEÑA, J.

WE CONCUR:


_____
KANE, Acting P.J.


_____
SARKISIAN, J.*

---

*Judge of the Fresno Superior Court assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

21.